890 F.2d 1483
 57 Ed. Law Rep. 685
 Robert L. DOWELL, an infant under the age of 14 years of
age, who sues by A.L. DOWELL, his father, as next
friend, Plaintiff-Appellant,
Vivian C. Dowell, a minor, by her father, A.L. Dowell, as
next friend; Edwina Houston Shelton, a minor, by her
mother, Gloria Burse; Gary Russell, a minor, by his father,
George Russell; Stephen S. Sanger, on behalf of himself and
all others similarly situated, Plaintiffs-Intervenors-Appellants,
v.
The BOARD OF EDUCATION OF THE OKLAHOMA CITY PUBLIC SCHOOLS,
INDEPENDENT DISTRICT NO. 89, OKLAHOMA CITY, OKLAHOMA, a
Public Body Corporate; Jack F. Parker, Superintendent of
the Oklahoma City, Oklahoma Public Schools; M.J. Burr,
Assistant Superintendent of the Oklahoma City, Oklahoma
Public Schools; Melvin P. Rogers, Phil C. Bennett, William
F. Lott, Mrs. Warren F. Welch, Foster Estes, Members of The
Board of Education of Oklahoma City Schools, Independent
District No. 89, Oklahoma County, Oklahoma; William C.
Haller, County Superintendent of Schools of Oklahoma County,
Oklahoma, Defendants-Appellees,
Jenny Mott McWilliams, a minor, and David Johnson
McWilliams, a minor, who sue by William Robert McWilliams,
their father and next friend, on behalf of themselves and
all others similarly situated; Renee Hendrickson, a minor,
Bradford Hendrickson, a minor, Teresa Hendrickson, a minor,
and Cindy Hendrickson, a minor, who sue by Donna P.
Hendrickson, as mother and next friend of each of said
minors; and Donna P. Hendrickson, Individually, and for
themselves, and all others similarly situated,
Defendants-Intervenors-Appellees,
David Webster Verity, a minor, by and through his next
friend, George L. Verity; George L. Verity and Ellen
Verity, for themselves and all others similarly situated;
Taejemo Danzie, a minor, by and through Mrs. A.J. Danzie,
her next friend; and Mrs. A.J. Danzie, for themselves and
all others similarly situated, Intervenors.
 No. 88-1067.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 6, 1989.
 
 Norman J. Chachkin (Julius L. Chambers and Janell M. Byrd, New York City, Lewis Barber, Jr. of Barber and Traviolia, Oklahoma City, Okl., and John W. Walker and Lazar M. Palnick of John W. Walker, P.A., Little Rock, Ark., with him on the briefs), New York City, for appellants.
 Ronald L. Day of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl., for appellees.
 Wm. Bradford Reynolds, Asst. Atty. Gen., David K. Flynn and Mark L. Gross, Dept. of Justice, on the briefs for the U.S. as amicus curiae.
 Before SEYMOUR, MOORE and BALDOCK, Circuit Judges.
 MOORE, Circuit Judge.
 
 
 1
 Since its genesis, this litigation has sought to eradicate the effects of an official policy of racial segregation in the public schools of Oklahoma City, Oklahoma, and assure that each child enrolled in an Oklahoma City school enjoys the same right to a public education. We are now at a crossroad in the substantive and procedural life of this case and must decide whether, after our last remand, the district court followed the correct path, terminating its prior decree and finding a new student assignment plan implemented under that decree constitutional. Dowell v. Board of Educ. of Okla. City Pub. Schools, 677 F.Supp. 1503 (W.D.Okla.1987). We approach this case not so much as one dealing with desegregation, but as one dealing with the proper application of the federal law on injunctive remedies. We believe that the law in this area is unambiguous, and simply because the roots of the matter lie in school desegregation, there is no reason to depart from the longstanding principles which form the structure of that law. Upon our review, we conclude the trial court did not follow the proper path and reverse the judgment dissolving the 1972 injunctive decree. We remand the case for modification of the decree consistent with this order.
 
 I. Background
 
 2
 We have previously summarized the history of this case, Dowell v. Board of Educ. of Okla. City, 795 F.2d 1516, 1517, n. 1 (10th Cir.), cert. denied, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986), tracing its metamorphosis from filing in 1961 to the generation of an equitable remedy in 1972. Dowell v. Board of Educ. of Okla. City Pub. Schools, 338 F.Supp. 1256 (W.D.Okla.1972). In 1986, when last before us, plaintiffs urged review of the district court's refusal to reopen the case to consider their petition for enforcement of the court's prior injunctive decree. The motion to reopen was triggered by the implementation of a new student assignment plan in 1984.
 
 
 3
 Until that time, defendants, the Board of Education of the Oklahoma City Public Schools, school officials, and individual board members, (the Board or defendants) operated the Oklahoma City School District (the District) under the Finger Plan, a court ordered desegregation plan prepared by Dr. John A. Finger, Jr., a Professor of Education at Rhode Island College and authority on issues of school desegregation.[1] Under the Finger Plan, attendance zones were redesigned so that high schools and middle schools enrolled black and white students. Black elementary students in grades 1 through 4 were bused to previously all white elementary schools while majority black elementary schools were converted into 5th-year centers with enhanced curricula. Black fifth graders then attended the 5th-year center in their neighborhood, while white fifth graders were bused for the first time into black neighborhoods to attend class. Excepted from the Finger Plan were certain schools enrolling grades K-5, which were designated "stand alone." These schools were located in neighborhoods that were racially balanced. Kindergarten children attended their neighborhood elementary school unless their parents chose to send them to another school to join a sibling or be closer to the parent's workplace. Aside from minor alterations necessitated, for example, by a school's closing, the Board maintained the District under the Finger Plan's basic techniques of pairing, clustering, and compulsory busing, even after the district court declared the District unitary and terminated the case. Dowell v. School Bd. of Okla. City Pub. Schools, No. CIV-9452, slip op. (W.D.Okla. Jan. 18, 1977).
 
 
 4
 Seven years later, the Board adopted a new student assignment plan, the Student Reassignment Plan, (the Plan), which was implemented for the 1984-85 school year. The Plan eliminated compulsory busing in grades 1 through 4 and reassigned elementary students to their neighborhood schools. A "majority to minority" transfer option (M & M) was retained to permit elementary students assigned to a school in which they were in the majority race to transfer to one in which the student would be in the minority. Fifth-year centers would remain throughout the District and, like the middle schools and high schools, would continue to maintain racial balance through busing. The Plan created the position of an "equity officer" assisted by an equity committee to monitor all schools to insure the equality of facilities, equipment, supplies, books, and instructors. Dowell v. Board of Educ. of Okla. City Pub. Schools, 606 F.Supp. 1548, 1552 (W.D.Okla.1985). The Plan professed to maintain integrated teaching staffs in line with the District's affirmative action goal. As a consequence of the Plan, eleven of the District's sixty-four elementary schools enrolled 90%+ black children. Twenty-one elementary schools[2] became 90%+ white and non-black minorities.[3] Thirty-two elementary schools remained racially mixed.
 
 
 5
 In February 1985, plaintiffs filed a motion to intervene and reopen the case claiming the Board unilaterally abandoned the Finger Plan. Although the record indicated the subsequent hearing was limited to "the question of whether this case shall be reopened and the applicants allowed to intervene shall be tried and disposed of," Dowell, 795 F.2d at 1523 (emphasis omitted), the district court received evidence on the constitutionality of the Plan and disposed of all of the substantive issues defendants raised. The district court concluded the Plan was constitutional and found no special circumstances justifying relief under Fed.R.Civ.P. 60(b) to support reopening. Dowell, 606 F.Supp. at 1557.
 
 
 6
 We reversed, holding the court abused its discretion in failing to reopen the case and prematurely reached the merits of the Plan's constitutionality without permitting plaintiffs the opportunity to support their petition for enforcement of the mandatory injunction which the court had never dissolved or modified. Dowell, 795 F.2d at 1523. Key to our disposition was the reassertion of the parties' burden of proof under Fed.R.Civ.P. 60(b).[4] We stated that on remand, the plaintiffs, beneficiaries of the original injunction, only have the burden of showing the court's mandatory order has been violated. "The defendants, who essentially claim that the injunction should be amended to accommodate neighborhood elementary schools, must present evidence that changed conditions require modification or that the facts or law no longer require the enforcement of the [1972] order." Id. (citation omitted) (emphasis added). Nothing in this disposition touched on the underlying constitutional issues. "[O]ur holding should not be construed as addressing, even implicitly, the ultimate issue of the constitutionality of the defendants' new school attendance plan." Id. at 1523. Remand was confined to a determination of "whether the original mandatory order will be enforced or whether and to what extent it should be modified." Id.[5]
 
 
 7
 During the eight-day hearing on these remand instructions, defendants[6] introduced a golconda of testimony and exhibits to establish their position that substantial demographic changes in the District rendered the Finger Plan inequitable and oppressive. The inequity, the Board maintained, surfaced primarily in the burgeoning number of schools that qualified for stand-alone status, thus necessitating that black children be transported greater distances to attend racially balanced elementary schools. Defendants' expert, Dr. William A. Clark, a specialist in population geography, testified on the migration and mobility of the black population in the District. Dr. Clark was satisfied that the residential pattern that developed in the District since the implementation of the Finger Plan was not a vestige of what had occurred thirty-five or forty years before and that "black preference" accounted for the dispersal of the black population throughout the District. While recognizing that socioeconomic factors must be considered in any housing decision, Dr. Clark maintained that the most significant motivation was preference.
 
 
 8
 Dr. Finis Welch, an economist at the University of California, offered testimony on studies he conducted of the dissimilarity and exposure indices of residential areas on which the Plan was based. Dr. Welch opined that the increasing number of stand-alones would "draw down" the 5th-year centers which, he projected, would result in closing more schools in the northeast quadrant, the area of central Oklahoma City which remains majority black.
 
 
 9
 Three Board members testified about their involvement in the preparation of the Plan. The District's superintendent, several black school administrators, and various members of the community offered their views on an array of issues, from linking neighborhood schools to black achievement, to the value of parental involvement in a child's education. Ms. Susan Hermes, a member of the committee which prepared the Plan, stated that she believed "educationally it is better for a child to have family nearby." (R. IV, 390). Over plaintiffs' objection, counsel for the Board asked each witness if he or she believed the District remained unitary after implementation of the Plan. The court, also over plaintiffs' objection, asked key defense witnesses if the Plan was adopted with discriminatory intent.
 
 
 10
 Through cross-examination and in its presentation of evidence, plaintiffs offered a contrasting analysis of the issues of demographic change, the impact of the Plan, and the Board's alternative approaches of the Effective Schools Program, increased parental participation in PTA, and equity supervision. Dr. John Finger, who had prepared the original plan, rejected each of these features of the new Plan noting that Effective Schools and increased parental participation deal with different problems and cannot be substituted for a desegregated education. Dr. Gordon Foster, a professor of education at the University of Miami, testified about a student assignment plan he had prepared for plaintiffs to solve the perceived inequities of busing under the Finger Plan.
 
 
 11
 In its subsequent order, the district court initially observed it was "now aware that it should have dissolved the injunction in 1977, as pointed out in the Circuit opinion, because the Oklahoma City schools were at that time, as they are today, operating as a unitary system, wholly without discrimination to blacks or other minority students, faculty or staff." Dowell, 677 F.Supp. at 1506. Nevertheless, the court apprehended the command we framed in our prior review. "The fundamental issue the court must address is whether the School Board has shown a substantial change in conditions warranting dissolution or modification of the 1972 Order." Id. Relying on the testimony of Drs. Clark and Welch, the court concluded:
 
 
 12
 [T]he Oklahoma City Board of Education has taken absolutely no action which has caused or contributed to the patterns of residential segregation which presently exist in areas of Oklahoma City. If anything, the actions of the Board of Education, through implementation of the Finger Plan at all grade levels for more than a decade, have fostered the neighborhood integration which has occurred in Oklahoma City.
 
 
 13
 Id. at 1512.
 
 
 14
 Thus, unlinking the Board from existing residential segregation and satisfied that demographic changes rendered the Finger Plan inequitable,[7] the court proceeded to examine the constitutionality of the Plan. Acknowledging that "[a] once unitary school district may lose its unitary status by partaking in intentionally discriminatory acts creating de jure segregation," id. at 1515, the court set forth the guidelines established in Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and Keyes v. School Dist. No. 1, Denver, Colo., 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).
 
 
 15
 The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the School Board which [was] intended to, and did in fact discriminate against minority pupils, teachers, or staff.
 
 
 16
 Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977).
 
 
 17
 The court reviewed the evidence and concluded that not only did legitimate nondiscriminatory factors motivate the adoption of the Plan, but, also, that the Plan currently maintained a unitary district which enjoyed increased parental and community involvement and included safeguards such as the equity officer and Effective Schools Program to insure continued unitariness. While the court entertained plaintiffs' contention that the Plan did have a disproportionate impact upon some blacks in the District, it concluded that racial imbalance in the schools, without more, does not violate the Constitution, citing Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). "It follows that a school board serving a unitary school system is free to adopt a neighborhood school plan so long as it does not act with discriminatory intent." Dowell, 677 F.Supp. at 1518. The court rejected plaintiffs' claim that the Plan is a step toward a dual school system as "ludicrous and absurd." Id. at 1524. In light of these findings of fact and conclusions of law, the district court determined the Foster Plan, plaintiffs' proposed modification of the 1972 decree, was neither feasible nor necessary.
 
 
 18
 Plaintiffs appeal this order, contending essentially that the district court misapplied the instructions on remand and misperceived the function of the unitary status achieved in 1977 to be a post-decree change in circumstances warranting dissolution of the injunction. In dissolving the injunction, plaintiffs urge the court abused its discretion by relying on clearly erroneous findings of fact.
 
 II. Standard of Review
 
 19
 At the outset, we must underscore this case involves an injunction upon which relief was sought pursuant to Fed.R.Civ.P. 60(b). Dowell, 795 F.2d at 1522.[8] Thus, our review focuses on whether the district court abused its discretion in granting the Board's motion to dissolve the injunction and denying plaintiffs' motion to modify the relief. On appeal we will not disturb the district court's determination except for an abuse of discretion. Securities and Exch. Comm'n v. Blinder, Robinson & Co., Inc., 855 F.2d 677 (10th Cir.1988). The district court's exercise of discretion, however, must be tethered to legal principles and substantial facts in the record. Evans v. Buchanan, 582 F.2d 750, 760 (3d Cir.1978), cert. denied, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). "[D]iscretion imports not the court's inclination, but ... its judgment; and its judgment is to be guided by sound legal principles." Franks v. Bowman Trans. Co., 424 U.S. 747, 770-71, 96 S.Ct. 1251, 1266-67, 47 L.Ed.2d 444 (1976) (citation omitted).
 
 III. Standard for Modification
 
 20
 While a court's equitable power to fashion a remedy is broad and its continuing duty to modify or vacate relief inheres to the prospective nature of the relief,[9] modification is subject to an exacting standard from which this circuit has not wavered. See Blinder, Robinson, 855 F.2d at 679; Equal Employment Opportunity Comm'n v. Safeway Stores, Inc., 611 F.2d 795 (10th Cir.1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980); Securities and Exch. Comm'n v. Thermodynamics, Inc., 464 F.2d 457 (10th Cir.1972), cert. denied, 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 588 (1973).
 
 
 21
 This standard, first articulated in United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), requires "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions ... to change what was decreed after years of litigation with the consent of all concerned."[10] The Court cautioned:
 
 
 22
 There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static and the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow.
 
 
 23
 Swift, 286 U.S. at 119, 52 S.Ct. at 464 (emphasis added).
 
 
 24
 Hence, to pass muster under this test, the party seeking relief from an injunctive decree "must demonstrate dramatic changes in conditions unforeseen at the time of the decree that both render the protections of the decree unnecessary to effectuate the rights of the beneficiary and impose extreme and unexpectedly oppressive hardships on the obligor." T. Jost, From Swift to Stotts and Beyond: Modification of Injunctions in the Federal Courts, 64 Tex.L.Rev. 1101, 1110 (1986). While the Swift language may also support a modification when the original purposes of the injunction are not fulfilled,[11] the standard still constricts the district court's inquiry.
 
 
 25
 Placed in other words, this means for us that modification is only cautiously to be granted; that some change is not enough; that the dangers which the decree was meant to foreclose must almost have disappeared; that hardship and oppression, extreme and unexpected, are significant; and that the movants' task is to provide close to an unanswerable case. To repeat: caution, substantial change, unforeseenness, oppressive hardship, and a clear showing are the requirements.
 
 
 26
 Humble Oil & Ref. Co. v. American Oil Co., 405 F.2d 803, 813 (8th Cir.), cert. denied, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969). Fed.R.Civ.P. 60(b) codifies this standard.
 
 
 27
 When the relief has been fashioned and the decree entered, "an injunction takes on a life of its own and becomes an edict quite independent of the law it is meant to effectuate." 64 Tex.L.Rev. 1101, 1105. For this reason, the court's jurisdiction extends beyond the termination of the wrongdoing, Battle v. Anderson, 708 F.2d 1523, 1538 (10th Cir.1983), because an injunction seeks to stabilize a factual setting with a judicial ordering and maintain that condition which the order sought to create. The condition that eventuates as a function of the injunction cannot alone become the basis for altering the decree absent the Swift showing. Securities and Exch. Comm'n v. Jan-Dal Oil & Gas, Inc., 433 F.2d 304 (10th Cir.1970). To do otherwise is to return the beneficiary of injunctive relief to the proverbial first square. It is for this reason that Swift remains viable.[12]
 
 
 28
 Thus, compliance alone cannot become the basis for modifying or dissolving an injunction. United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); Jan-Dal Oil & Gas, Inc., 433 F.2d at 304.[13] Nor can a mere change of conditions alter the prospective ordering of relationships embodied by a permanent injunction. The party subject to the decree must establish by clear and convincing evidence that conditions which led to the original decree no longer exist, or the condition the order sought to alleviate, a constitutional violation, has been eradicated.[14] Until this showing is made, the decree stands.
 
 
 29
 Nevertheless, a permanent injunction empowered by a court's continuing jurisdiction does not presume that its underlying circumstances or the rights achieved remain static. "By its forward cast, an injunction contemplates change and must be sufficiently malleable to adapt the ordered relief to contemporary circumstances." United States v. Lawrence County School Dist., 799 F.2d 1031, 1056 (5th Cir.1986). Thus, while principles of res judicata may be applied to the factual finding of unitariness at the time the finding is made with the injunction in place, we have recognized that this past finding alone does not bar reconsideration of the decree. Dowell, 795 F.2d at 1519.
 
 
 30
 In contending there should be a different standard employed in school desegregation cases, the dissent miscasts our basic premise. We do not imply perpetual supervision of public schools by federal courts, nor do we suggest the Board is incapable of complying with constitutional mandates. We take the simple position that an injunctive order entered in a school desegregation case has the same attributes as any other injunctive order issued by a federal court, and that it is binding upon all parties until modified by the court which entered the order in the first instance. We add, as the trial court initially recognized, the injunctive order can be modified or dissolved only upon a finding of changed conditions. In this context, the intent of the defendants has little, if any, relevance.
 
 IV. Purpose of Injunctive Relief
 
 31
 In 1972, having found "the Defendant School Board has totally defaulted in its acknowledged duty to come forward with an acceptable plan of its own," Dowell, 338 F.Supp. at 1271, the district court held that "[p]laintiffs are entitled to a decree requiring the reasonably immediate conversion of the Oklahoma City Public Schools into a unitary school system." Id. at 1272 (citations omitted). The Board was ordered not to alter or deviate from the plan without "the prior approval and permission of the court," and the order was made binding on the Board, "its members, agents, servants, employees, present and future, and upon those persons in active concert or participation with them." Id. at 1273.
 
 
 32
 The decree embodied the constitutional mandate to eliminate "root and branch" racial discrimination enforced through a dual school system. Green v. County School Bd. of New Kent County, Va., 391 U.S. 430, 437, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716 (1968). The resulting terrain circumscribed by the injunction was later declared unitary upon the district court's finding certain components of unitariness to have been satisfied.[15] "[U]nitariness is less a quantifiable 'moment' in the history of a remedial plan than it is the general state of successful desegregation." Morgan v. Nucci, 831 F.2d 313, 321 (1st Cir.1987).[16] While a declaration of unitariness addresses the goals of injunctive relief, it alone does not sweep the slate clean.
 
 
 33
 Nor, in our view, does a finding of unitariness mandate the later dissolution of the decree without proof of a substantial change in the circumstances which led to issuance of that decree. Dowell, 795 F.2d at 1521; contra United States v. Overton, 834 F.2d 1171 (5th Cir.1987); Riddick v. School Bd. of Norfolk, 784 F.2d 521 (4th Cir.), cert. denied, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).[17] Until that showing, "those who are subject to the commands of an injunctive order must obey those commands, notwithstanding eminently reasonable and proper objections to the order, until it is modified or reversed." Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 439, 96 S.Ct. 2697, 2706, 49 L.Ed.2d 599 (1976). It is imperative that the rights of the party for whose benefit an injunction has been entered are affected by no one unless a court determines the injunction in current form is no longer necessary to achieve the court's original objective. It is also imperative that when considering whether to vacate or modify an injunctive decree, the district court not retry "the original premises of the judgment; instead, any modification must be confined and tailored to the change in circumstance that justifies the modification." Lawrence County School Dist., 799 F.2d at 1056. Necessarily, however, in conducting a factual inquiry into the changed conditions pled, the court must reexamine whether the underlying substantive obligations are preserved. See B. Landsberg, The Desegregated School System and the Retrogression Plan, 48 La.L.Rev. 789 (1988).[18]
 
 V. Burden of Proof
 A.
 
 34
 Nevertheless, in this case, unilaterally and without prior approval from the district court, as required by the injunctive decree, the Board implemented the Plan. It is uncontested that the contents of the Plan are contrary to the explicit dictates of the injunction. As we previously noted, the Board's action creates a "special circumstance which permitted plaintiffs to return to court and test the presumptions premised in the declaration of unitariness." Dowell, 795 F.2d at 1522. We so instructed the district court.
 
 
 35
 The first presumption we address, then, is whether the Board's Plan maintains the unitary status of the District since the injunction remained in effect when the Board restored neighborhood schools for elementary student assignments.[19] This presumption flows from the Board's continuing affirmative duty to "accomplish desegregation," Swann, 402 U.S. at 32, 91 S.Ct. at 1284, to attain "maximum practicable desegregation," Morgan v. McDonough, 689 F.2d 265, 280 (1st Cir.1982), and to protect the constitutional rights of the class protected by the equitable remedy. Keyes v. School Dist. No. 1, Denver, Colo., 609 F.Supp. 1491, 1515 (D.Colo.1985). The remedy "must survive beyond the procedural life of the litigation." Dowell, 795 F.2d at 1521.
 
 
 36
 That thirty-two of the sixty-four elementary schools in Oklahoma City emerge from the Plan as one-race majority schools not only establishes a prima facie case that the decree has been violated and the presumption of unitariness challenged, but also satisfies plaintiffs' burden in reopening and shifts the burden to defendants to produce evidence of changed circumstances or oppressive hardship.
 
 
 37
 [I]n a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition ... The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.
 
 
 38
 Swann, 402 U.S. at 26, 91 S.Ct. at 1281. The Board bears a "heavy burden" to show that its implementation of the Plan does not "serve to perpetuate or re-establish the dual school system." Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (quoted in Clark v. Board of Educ. of Little Rock School Dist., 705 F.2d 265, 271 (8th Cir.1983)). This burden is not alleviated after a finding of unitariness when the decree remains in place but is focused on the Swift inquiry whether "anything has happened that will justify us now in changing a decree." 286 U.S. at 119, 52 S.Ct. at 464.
 
 
 39
 The Board sought to prove that substantial demographic change in the District established new conditions that were unforeseen at the time the decree was instituted and which now produced "hardship so 'extreme and unexpected' as to make the decree oppressive." Equal Employment Opportunity Comm'n v. Safeway, 611 F.2d at 800 (quoting Swift, 286 U.S. at 119, 52 S.Ct. at 464). While the record sets forth changed circumstances not unlike those contemplated by Swann, it fails to establish "the dangers the decree was meant to foreclose must almost have disappeared." Humble Oil & Ref. Co., 405 F.2d at 813.
 
 B.
 
 40
 In its factual findings, the district court relied on relocation statistics offered by defendants' experts, Drs. Clark and Welch. Although Dr. Clark's evidence indicated black families had relocated within and outside of the District,[20] he conceded that his examination focused only on seven inner-city tracts and not on additional predominantly black residential tracts to the north of the studied area. (R. II, 93-94). While Dr. Clark's study establishes there is a substantial decrease in black population in these particular tracts, it reveals the same decrease for total population.[21] Both on direct and cross-examination, Dr. Clark stated that the area encompassing the seven tracts underwent "land use transition," (R. II, 68) and that construction of interstate highways, I-40 and I-35, and developments in institutions, notably the hospital complex, had "dramatic impact" on population movement in some of the studied tracts. (R. II, 68).
 
 
 41
 Based on this testimony, the court concluded there was "a substantial amount of turnover in the black population residing in the east inner-city tracts." Dowell, 677 F.Supp. at 1507. This conclusion is also premised on metropolitan census data compiled from completion of a long census form. While the long census form asks the respondent whether he or she lived in the same house five years before, it does not determine whether the respondent moved out of the District or merely down the street. The basis for the turnover[22] rate is thus incomplete, rendering the census form suspect.[23]
 
 
 42
 Using census figures, Dr. Clark calculated that the percentage of black population residing in these tracts in Oklahoma City between 1960 and 1980 decreased by 67.2%.[24] Despite his statement about external forces affecting population movement, Dr. Clark concluded that "private preference" was the chief motivating factor in determining where people chose to live.[25] (R. II, 113). Dr. Clark observed the "strong disinclination" of whites to move into predominantly black neighborhoods and their coincidental inclination to move out of neighborhoods that become 25 to 30% minority. (R. II, 105). He conceded that majority black areas would then be unlikely to change unless the black population moved elsewhere. (R. II, 106). The district court thus observed, "Some blacks were choosing to live within the area and others were choosing to move away. (Tr. 71)." 677 F.Supp. at 1507.
 
 
 43
 The district court also relied on the testimony of Dr. Welch who presented statistical analyses of the racial composition of residential attendance zones in the District from 1972 to 1986 and then used these figures to project racial composition in 1995. Based on Dr. Welch's calculations, the court noted that "the exposure of blacks to non-blacks almost doubled." 677 F.Supp. at 1508.[26] Embracing Welch's analysis which included a ranking of the 125 school districts he had studied, the court declared, "the Oklahoma City school district experienced the eighth largest reduction in the index of dissimilarity or, in other words, the eighth greatest improvement in integration, during the period from 1968 to 1982 (Def.Ex. 27; Tr. 130-31)." 677 F.Supp. at 1508.[27] The court noted that "[e]ven after implementing the K-4 neighborhood school plan, the degree of overall dissimilarity among the races attending school in Oklahoma City was less than that of Tulsa, Oklahoma, whose index was .557. (Def.Ex. 38)." 677 F.Supp. at 1508.[28] Similarly, the district court relied on a comparison of the District figures following implementation of the Plan with figures from other "unitary districts in the country."[29] Noting the change in the dissimilarity index from .78 prior to implementation of the Finger Plan to .24 in 1984, the district court stated "the index rose slightly to .38" in 1985 with the reintroduction of neighborhood schools. 677 F.Supp. at 1509. Contrary to the district court's characterization, the rise in the index represents a 58% increase in the ratio of blacks to non-blacks. Despite this expansion of dissimilarity, the court concluded the "increased residential integration in Oklahoma City has resulted in a much lower level of dissimilarity today in the neighborhood elementary schools (.56) than existed in 1971 before the Finger Plan was implemented (.83). (Def.Ex. 44; Tr. 187)." 677 F.Supp. at 1509.
 
 
 44
 On the basis of Def.Ex. 20, two graphs plotting enrollment figures for the District for white, black, and non-black minority students, grades K-12, the court concluded "the student body is truly multi-cultural."[30] 677 F.Supp. at 1509. Nevertheless, the court acknowledged the Plan created "some schools," eleven, which are 90%+ black but observed "the plan created no schools which are 90% or more white." Id. at 1510. The Plan, however, created twenty-one schools that had less than 10% black student enrollment.
 
 
 45
 The district court does not address contrasting evidence in the record. Unmentioned by the court is plaintiffs' cross-examination of Dr. Welch which produced testimony directly controverting that of Dr. Clark[31] and undermined the method employed to create the figures the Board relied on to represent substantial demographic change and the oppressiveness of the decree. Noting that he used two different methods for calculating the 1974 to 1986 figures and the 1986 to 1995 figures, Dr. Welch conceded: "And I really didn't want an inconsistent forecast. I thought someone would be cross-examining me. And so I designed the procedure to be completely internally consistent." (R. III, 244). His numbers, he stated, were "guesstimates." (R. III, 246).
 
 
 46
 In addition, the court does not reference the testimony of Dr. Yale Rabin, plaintiffs' expert in population distribution. Using U.S. Census data, Dr. Rabin compared and analysed the black population in the District between 1950 and 1980. According to these census tract figures, the black population expanded from one tract in which approximately 25% of the District black population resided, to sixteen tracts 75%+ black, including 60.8% of the District's black population. He explained that as the area expanded spatially from one tract in 1950 to six tracts in 1960, thirteen tracts in 1970, and sixteen tracts in 1980, each expansion included the original all-black tracts. (R. VII, 1125-31). Dr. Rabin controverted Dr. Clark's conclusion that the black population had dropped to 16.9% in 1980 in the six tracts. "[T]he area of concentration itself has changed, and it's misleading to refer, in each successive decade, to the same six tracts as the area of concentration." (R. VII, 1133). Dr. Rabin not only recognized the substantial population displacement caused by institutional and highway development but focused the effect of Def.Exs. 7 and 8, maps showing the numbers of black families and general direction of movement in and out of the District. For example, Dr. Rabin noted that while 46 families moved into white areas from the northeast quadrant from 1974 to 1978 (Def.Ex. 7), many thousands of blacks live in the subject tracts, thus putting the significance of the turnover numbers into perspective. (R. VII, 1157). In fact, the more predominant population shift, 148 families, was within the northeast quadrant.
 
 
 47
 Most importantly, Dr. John Finger, plaintiffs' expert, underscored that the Board's statisticians had "changed the rules." (R. VIII, 1207). He explained,
 
 
 48
 There will be no schools that have less than ten percent minority, but there will be schools that have less than ten percent black. How you label these as segregated or not is what the words mean, and segregated has always been a difficult word.
 
 
 49
 (R. VIII, 1208).
 
 
 50
 Permeating the testimony on demographic change were sharply contrasting views on the impact of busing on children of "tender age." 677 F.Supp. at 1526. Numerous lay witnesses and District personnel testifying on behalf of the Board generally stated that busing young children had an adverse, emotional impact on the child.[32] Defendants' expert witness, Dr. Herbert Walberg, a research professor at the University of Illinois, offered a study he completed showing that black children who were transported to school tested lower than black children who did not ride a school bus. Plaintiffs' witness, Dr. Robert Crain, who was qualified an expert on school desegregation, stated that Walberg's study was "absolutely indefensible" because it omitted critical covariant factors like socioeconomic status in the analysis. (R. VII, 1008). Dr. Crain stated that in light of the fact that half of all public school students ride a school bus and that only 5% of those children are bused for desegregation purposes, the evidence of the harmful effects of transportation on student achievement and emotional development is suspect. The district court did not reference plaintiffs' evidence on this issue.
 
 C.
 
 51
 Based on the divergent testimony on demographic change, the court concluded the Board had not taken action to cause or contribute to presently existing residential segregation but "[i]f anything, the action of the Board of Education, through implementation of the Finger Plan at all grade levels for more than a decade, have [sic] fostered the neighborhood integration which has occurred in Oklahoma City." 677 F.Supp. at 1512. Previously, in summarizing the relocation statistics, the court observed, "These relocation studies reveal the compulsory busing of black children to a certain area does not have any appreciable affect [sic] on where their parents choose to relocate. (Tr. 76-77)." 677 F.Supp. at 1508.
 
 
 52
 That demographic change of some degree occurred within the District after the Finger Plan was instituted is apparent. As Swann observed, "It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so." 402 U.S. at 31, 91 S.Ct. at 1283. Nevertheless, we are reluctant to hitch the preservation of hard-won constitutional rights to numbers alone. "Unitary status is not simply a mathematical construction." Morgan, 831 F.2d at 321. As the district court observed in Keyes v. School Dist. No. 1, Denver, Colo., 609 F.Supp. at 1516, "The expert testimony in this case concerning the use of racial balance and racial contact indices, and the differing conclusions reached by the experts called by the respective parties, demonstrate once again the facility with which numerical data may be manipulated and discriminatory policies may be masked." In Oklahoma City, the sum total of all of the numbers immutably underscores the emergence of eleven all-black elementary schools and twenty-one 90%+ white and non-black minority schools, roughly half of the District's elementary schools, with the reinstitution of neighborhood black schools for the elementary grades. In fact, when the actual numbers of children attending District elementary school are run, the result is even more dramatic. Of the approximately 6,464 black students[33] attending the District's elementary schools K-4, 2,990, or 46.2% of all black elementary children in the District attend the eleven 90%+ black elementary schools.[34]
 
 D.
 
 53
 Similarly, we are unable to conclude that these same numerical calculations support a finding that the Finger Plan became a hardship "extreme and unexpected," Humble Oil & Ref. Co., 405 F.2d at 813, because of the unintended impact of the stand-alone schools. This hardship was projected to arise if a school became stand-alone, necessitating busing black students, who had been bused into that school, even greater distances to attend an integrated school. With more students attending naturally integrated K-5 schools, the 5th-year centers in the black community would then have to close.
 
 
 54
 As viewed by the district court, the creation of Bodine Elementary School in southeast Oklahoma City as a K-5 stand-alone caused the Board to focus on the "perceived inequities" of the stand-alone feature. 677 F.Supp. at 1513. According to the minutes of the Board meeting which addressed the question of making Bodine a K-5 rather than a K-4 stand-alone,[35] Board members voiced several concerns over the process of deciding which schools qualified and became stand-alone. (Def.Ex. 76). Dr. Clyde Muse, a black Board member, objected that the creation of Bodine stifled growth in the northeast quadrant and was yet another example of "a concerted effort to see to it that not only will the black community or the northeast quadrant not integrate, there also seems to be a concerted effort on somebody's part to see that it always remains impoverished." (Def.Ex. 76 at 349). Dr. Muse lamented the inevitable closing of schools in the northeast quadrant and urged the District undertake a study to determine what changes had occurred that could result in a more equitable plan for the District rather than the apparent piecemeal approach. Id. Another Board member, Ms. Jean Brody, urged the District to undertake a comprehensive study to avoid what she perceived as random planning that resulted in Bodine's becoming a K-5 stand-alone, but postponed Rockwood Elementary School's becoming stand-alone although it fully qualified and had the capacity to become a K-5 school.[36]
 
 
 55
 In voting to make Bodine a K-5 stand-alone, the Board rejected the advice of Dr. Paul Heath, a board member, that the K-5 concept was educationally unsound and would ultimately adversely impact the entire District. Of concern to participants at the meeting was the fact that in going to K-5 status, Bodine fifth graders would give up the opportunity to participate in special programs like strings and visual arts offered at the 5th-grade centers. (Def.Ex. 76). On the positive side, however, student reassignments necessitated by making Bodine stand-alone were not expected to impact the existing 5th-grade centers. (Def.Ex. 76).
 
 
 56
 Similarly, the trial testimony on the hardship of stand-alone schools echoed some of those concerns and underlined that the Board's planning was based on theoretical conjecture, speculative forecasting, and discretionary decision making. At the outset, Dr. Welch noted that of the eleven stand-alone schools open in 1972, only three retained this status in the District in 1984.[37] (R. III, 289). The projected number of stand-alones was tied to Dr. Welch's 1995 District calculations. A senior researcher for the District, who monitored student assignments and helped prepare projections on stand-alones, stated that although ten schools were eligible for stand-alone status, only three were then stand-alone. He stated that in order to create a stand-alone, the eligible school had to have the capacity to absorb the increased number of students. (R. IV, 495-96); see also Def.Ex. 69. Internal Board memoranda also addressed the possibility of creating additional stand-alones by altering attendance boundaries, exploring reassignment options,[38] and opting for either K-4 or K-5 stand-alones. (R. IV, 498). Dr. Finger stated that the original plan anticipated making as many schools stand-alone as qualified even if some busing distances increased. "But, ... these things get to be political." (R. VIII, 1201). The 5th-grade centers, he stated, were considered temporary and were designed to be incorporated into the middle schools.
 
 
 57
 The stand-alone feature, thus, emerged from the evidence as a matter of speculation tied to capacity problems, budget constraints, and local politics. Nevertheless, it was the cornerstone upon which advocates of the need to modify or dissolve the Finger Plan built their claim of hardship.
 
 VI. Impact of Plan on Modification
 A.
 
 58
 We are satisfied the evidence reveals that because of population shifts in the District, it was necessary to modify the Finger Plan. It is within the court's equitable power to modify the Finger Plan to mirror these changed circumstances, to retain the unitariness of the District, and reflect the Board's continuing duty under the decree. Just as the court can tailor the relief to modification, so too can it dissolve the injunction upon finding "that what it has been doing has been turned through changing circumstances into an instrument of wrong." Swift, 286 U.S. at 114-15, 52 S.Ct. at 462. Unfortunately, the district court perceived this duty entirely in terms of the Board's alleged discriminatory intent in adopting the Plan. This perception overlooks the essential point. Given the changes that emerge from all of the evidence presented, the court must determine whether the Plan ameliorates those conditions. Dissolution is appropriate only if the evidence unmistakably reveals the Plan encompasses the changed circumstances and maintains the continuing prospective effect of the decree.
 
 
 59
 Again, to undertake this analysis, the court must direct its attention to "the question of the withdrawal or modification of injunctive relief granted in the past ... where the Cardozo [Swift ] precepts are the operating guidelines." Humble Oil & Ref. Co., 405 F.2d at 814. Thus, while the Board's motive may be one circumstance in evaluating the effect of the Plan, it is only an element affecting the ultimate decision. An unimpeachable motive cannot obscure the essential question, does the Plan relieve the effects of changed circumstances and potential hardship? Only a positive response will merit dissolution.
 
 B.
 
 60
 The issue then becomes whether the Board's action in response to the changed conditions has the effect of making the District "un -unitary" by reviving the effects of past discrimination. The new Plan must be judged in light of the old plan to assure it mirrors actual changes in the District without so radically departing from the original decree that the rights secured by that decree are vitiated.
 
 
 61
 Swann guides our review in this inquiry by focusing our attention on the Board's continuing duty to remedy the effects of past discrimination until "it is clear that state-imposed segregation has been completely removed." 402 U.S. at 13, 91 S.Ct. at 1274; see also Columbus Bd. of Ed. v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979).[39] The inquiry into whether the Plan maintains unitariness in student assignments may concretely be directed to evaluating (1) the number of racially identifiable schools; (2) the good faith of school officials in the desegregation effort and running the schools; and (3) "whether maximum practicable desegregation of student bodies at the various schools has been attained." Morgan, 831 F.2d at 319. See also Ross v. Houston Indep. School Dist., 699 F.2d 218, 227 (5th Cir.1983) ("[T]he decision that public officials have satisfied their responsibility to eradicate segregation and its vestiges must be based on conditions in the district, the accomplishments to date, and the feasibility of further measures.").[40] No one factor is dispositive of the determination that unitariness is preserved. However, once dismantled, the dual school system should remain dismantled.
 
 
 62
 Thus, we are troubled because the evidence indicates the Board's implementation of a "racially neutral" neighborhood student assignment plan has the effect of reviving those conditions that necessitated a remedy in the first instance. Under these circumstances the expedient of finding unitariness does not erase the record or represent that substantial change in the law or facts to warrant overlooking the effect of the Board's actions.[41]C.
 
 
 63
 The district court was satisfied the Plan was adopted to remedy the increased busing burdens on young black pupils, avoid closing 5th-year centers in the northeast quadrant, and eliminate the inequities of stand-alone schools. Despite the emergence of one-race elementary schools, the court found the Plan did not disturb the District's unitariness. The district court concluded that unless the Plan was adopted with discriminatory intent, a neighborhood school plan that has the effect of creating one-race schools is not constitutionally infirm.
 
 
 64
 To reach this conclusion, the court examined the remaining components of the Plan. While school faculties were not in perfect racial balance, particularly in the 90%+ black elementary schools, the court found that negotiated agreements with the teachers' union and teacher preference and seniority accounted for the imbalance and not Board policy.
 
 
 65
 The court did not address plaintiffs' exhibits 48, 50, 52, and 54. The exhibits compare elementary school enrollment with the racial composition of faculty from 1972 to 1986-87 and reflect the growing parity of imbalance between faculty and students. By 1986-87, the 90%+ black elementary schools are staffed by predominantly black teachers.[42] Although the executive director of personnel testified that especially after 1985,[43] teacher assignments would comply with the District's affirmative action goal of 36.9% with a 10% variance factor, the numbers belie the aspiration.
 
 
 66
 Nevertheless, the court was satisfied that recent Board action would "bring[ ] elementary faculties into racial balance in 1987-88," 677 F.Supp. at 1519, based on the statement of the District's affirmative action program planner. However, the record fails to support this conclusion with any specific evidence of change to overcome plaintiffs' documented countertrend.
 
 
 67
 The district court believed that other factors in the equation maintained the District's unitariness and offset the racial imbalance in the elementary schools. Of prime importance was the majority-to-minority transfer option which represented to the court that "parents in Oklahoma City today have a choice. No pupil of a racial minority is excluded from any school in Oklahoma City on account of race." 677 F.Supp. at 1523. The record does not support this assertion. In fact, there is little evidence to determine the effectiveness and utilization of the transfer option. Dr. Belinda Biscoe, an administrator in the department of support programs, testified that letters were sent after the Plan was implemented informing parents of the M & M option, but no follow-up was done. Dr. Biscoe expressed the concern, apparently voiced by the District superintendent, that parents needed more information about the option. (R. III, 327). Asked if the Board had studied the program to determine who was exercising the transfer option, Dr. Biscoe answered that she did not believe the numbers had been analysed. (R. III, 327). Dr. Betty Mason, the assistant superintendent of high schools, agreed that the M & M policy could not serve to desegregate the schools in the northeast quadrant (R. V, 609) and was limited by the capacity of the receiving school. Although Dr. Finger acknowledged the M & M option might work if parents understood the alternative and were willing to exercise it, he observed that often those children who most need desegregated schools would be "the least likely to take that option." (R. VIII, 1196). Another defense witness believed the transfer option was available for "convenience." (R. VI, 837). There is simply no other evidence in the record to support the court's conclusion that parents understand the availability of the option and freely exercise it. Indeed, the court's analysis of the figures indicating 332 parents exercised the option the first year of the Plan and 181 the following year suggests otherwise. 677 F.Supp. at 1523.
 
 
 68
 Likewise, the effect of the Board's desire to maintain the District's unitariness by implementing programs like Effective Schools, Student Interaction, Adopt-A-School, and the position of Equity Officer is equally undocumented. The District's Effective Schools program incorporates educational aspirations and attempts to translate those values into enhanced student achievement. (R. VI, 918-19). Although the court hailed a 13% decrease in the gap between black and white achievement test results in the District as evidence that the Effective Schools program was working, the test comparisons are flawed. The group of students studied one year is not the same studied the next year. (R. V, 744); see Def.Ex. 185. While there appeared to be some gain in achievement at eight of the 90%+ elementary schools as measured against the national average, scores at two 90%+ schools dropped. (R. VI, 942). More significantly, the meaning of the gain was not clear.[44] Additional testimony established that the Effective Schools program is geared to the upper grades (R. VII, 1004-05) and tied to budgetary constraints experienced by the District. (R. VI, 881). While the testimony was consistent that the concepts of "Effective Schools" and desegregated schools are not mutually exclusive, (R. V, 693) Board witnesses suggested that increased expenditures for busing would necessarily cut into the Effective School's budget. (R. VI, 944). Most importantly, there is no evidence of specific educational programs designed for those racially identifiable elementary schools to counteract the effect of concentrating low achievement in these schools.
 
 
 69
 The Board designed the Student Interaction Plan to pair schools 90%+ black with schools that do not have significant racial minority populations. (R. IV, 394-95). Teachers were encouraged to bring students together two to four times a year and "to allow children to write letters to each other; to send video cassettes of themselves ... to have the children read the same literature." (R. IV, 395). Although the program was discretionary with each classroom teacher, the Board hoped that perhaps nine to twelve hours a year would be devoted to the Interaction plan. (R. IV, 407). In contrast, plaintiffs' witness, Dr. Crain, rejected the value of student interaction based on exchanges of letters and infrequent visits to a paired school.[45] Meaningful interaction, he suggested, took place on a school athletic team or in a boy scout troop.
 
 
 70
 When the Plan was adopted, an Equity Committee chaired by an Equity Officer[46] was established to oversee the District and assure that facilities and equipment were relatively equal throughout the District. While the Board could be responsive to small dollar equipment adjustments (R. VI, 840) or building maintenance problems (R. VI, 834) recommended by the committee, its ability to effect a "major facility repair" or reduce overcrowding, for example, at a predominantly black 5th-year center, was constrained by funding reductions in the District and the consequent need to seek a bond election. (R. III, 370-72).
 
 
 71
 Similarly, the Adopt-A-School program, "a partnership between the public sector and the private sector," (R. V, 716) to provide resources, speakers, tutors, and money to community schools, does not counteract the imbalance created by the reinstitution of neighborhood schools. Like the considerable testimony about the increased participation of District parents in school PTA-PTO groups,[47] this evidence does not substitute for the constitutional mandate to maintain a unitary school system. In other words, while each program is laudable in principle and addresses a particular educational or community value, the program does not ameliorate the condition created by the Plan, the emergence of thirty-two effectively one-race schools.
 
 D.
 
 72
 Although the court accepted the statements of school personnel and community members who "unequivocally testified that in their opinion the Board's K-4 neighborhood school plan was not discriminatory and did not result in the recreation of a dual school system," 677 F.Supp. at 1519, the quest for discriminatory intent is not so straightforward.[48] Indeed, the court asked various witnesses, lay and expert, if they believed the Plan was adopted with discriminatory intent.[49] One witness was asked if he believed the court should continue its supervision of the District. (R. VI, 953). Thus assured, the court concluded the Plan retained the District's unitariness and, in fact, enhanced it by fostering a greater degree of parental and community involvement in the schools. In light of this conclusion, the court wholly rejected plaintiffs' assertion that the Plan's incorporation of the same attendance zones used prior to the Finger Plan was evidence of the Board's discriminatory intent. Citing Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), the court responded that "discriminatory intent may not be inferred solely from the disproportionate impact of a particular measure upon one race." In so concluding, the court narrowed its focus and overlooked the broader inquiry mandated by Swann.
 
 
 73
 Indeed, discriminatory intent cannot be ascertained by eliciting opinion testimony from witnesses, often out of context[50] and accumulating those responses as substantive evidence of the motive for the Plan. "Ordinarily, only circumstantial evidence is available to establish segregative intent." Diaz v. San Jose Unified School Dist., 733 F.2d 660, 662 (9th Cir.1984). In Keyes v. School Dist. No. 1, Denver, Colo., 670 F.Supp. 1513 (D.Colo.1987), the court stated:
 
 
 74
 [S]ome discriminatory intent must be shown to prove a violation of the constitutional requirement that educational opportunity must be equally available. That intent is not, however, measured by the good faith and well meaning of individual Board members or of the persons who carry out the policies and programs directed by the Board. The intent is an institutional intent which can be proved only by circumstantial evidence.
 
 
 75
 Id. at 1516.
 
 
 76
 We also agree that neither "the foreseeability of segregative consequences" alone nor the emergence of one-race schools alone establishes a prima facie case of purposeful racial discrimination. Dayton Bd. of Educ., 443 U.S. at 536, n. 9, 99 S.Ct. at 2978 n. 9. We must look at other circumstantial evidence, "the historical background and specific sequence of events leading up to the Board's actions maintaining or exacerbating ethnic imbalance in the district schools." Diaz, 733 F.2d at 663 (citation omitted).
 
 
 77
 Swann directs "an assignment plan is not acceptable simply because it appears to be neutral." 402 U.S. at 28, 91 S.Ct. at 1282. The Court stated:
 
 
 78
 [S]uch [neutral] plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a "loaded game board," affirmative action in the form of remedial altering of attendance zones is proper to achieve truly non-discriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral.
 
 
 79
 Id. (emphasis added). Within the context of the finding of unitariness, the Plan must be judged by its effectiveness in maintaining unitary status. Davis v. Board of School Comm'rs of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). Thus, under Swann, we must total all of the evidence to decide if the district court correctly found the Plan maintained unitariness in student assignments.[51]
 
 
 80
 It is on this basis that we conclude the district court clearly erred in its findings of fact and consequent legal determinations. While we recognize the dedicated care and tireless, patient effort with which the court has managed and overseen this case, we cannot abandon our obligation to review all of the evidence. Thus, although there is evidence to facially support the district court's findings, on the entire evidence we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948). Because the court failed to address or distinguish plaintiffs' contrary evidence, and because the court cast the evidence on which it relied in a form to provide an answer to the single question of discriminatory intent, we are convinced that the basis on which the court fashioned dissolution of the injunction was flawed.
 
 VII. Relief
 
 81
 Thus, we must focus not on whether the Plan is nondiscriminatory but whether it solves the problems created by the changed conditions in the District. We are certain it does not. While there is evidence of demographic change, that evidence does not support a return to the neighborhood schools in the elementary grades because the same neighborhoods remain predominantly white and predominantly black. Moreover, the Plan restores the effects of past discriminatory intent remedied by the decree by recreating racially identifiable elementary schools, overlooking school capacity problems, and failing to address faculty imbalance. Addressing these shortcomings does not overburden Swann 's remedial baggage.[52]
 
 
 82
 We are mindful that Swann contemplates actions which are systemwide in effect,[53] and the Plan affects only the elementary schools, leaving the Finger Plan in place for the middle and high schools. Nevertheless, we are convinced that the impact of the Plan on the District as a whole is greater than the sum of each of these parts.[54] As Judge Wisdom noted, "Infection at one school infects all schools. To take the most simple example, in a two school system, all blacks at one school means all or almost all whites at the other." United States v. Texas Educ. Agency, 467 F.2d 848, 888 (5th Cir.1972) (quoted in Keyes, 413 U.S. at 201, 93 S.Ct. at 2694). Indeed, "[t]he effect of a racially discriminatory practice is pervasive. That effect is not eradicated by merely erasing the original cause." Lawrence County School Dist., 799 F.2d at 1044.
 
 
 83
 The focus of our concern remains on the Board's duty. "Part of the affirmative duty imposed by our cases ... is the obligation not to take any action that would impede the process of disestablishing the dual system and its effects." Dayton Bd. of Educ. v. Brinkman, 443 U.S. at 538, 99 S.Ct. at 2979 (1979). Despite its cosmetic trappings, the Plan is such an impediment. While the Board's concerns are not without foundation, they do not translate into the maintenance of a unitary system. "And, it is the responsibility of boards of education and the district courts to prevent the reestablishment of such school systems." Graves v. Walton County Bd. of Educ., 686 F.2d 1135, 1143 (5th Cir.1982).
 
 
 84
 We are also satisfied based on our review of the record that modification of the Finger Plan is achievable without extreme disruption or burdensome expense. No geographical barriers have created the racial imbalance in the elementary schools. Morgan v. Nucci, 831 F.2d at 313 (unique geographic isolation caused by Boston Harbor justified single one-race middle school).[55] Nor was the evidence of white flight sufficient to justify the Plan.[56] See Lee v. Anniston City School Sys., 737 F.2d 952, 957, n. 3 (11th Cir.1984) (plans designed to mitigate white flight are permissible provided desegregation effort not frustrated); Liddell v. Missouri, 731 F.2d 1294, 1313-14 (8th Cir.), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984) (fear of white flight is no excuse to avoid desegregation).
 
 
 85
 We do not ask that "each school be a statistical image of the [District]." Lawrence County School Dist., 799 F.2d at 1047. Nor do we suggest annual assignment alterations to mirror the ever-changing demographic makeup of this urban setting. However, on the basis of the record, it is clear that other measures that are feasible remain available to the Board " 'to improve the fit between a decade of demographic changes ... and the terms of student access to educational opportunities.' " Morgan, 831 F.2d at 318 (quoting district court order, Morgan v. Nucci, 620 F.Supp. 214, 220 (D.Mass.1985)).
 
 
 86
 Our remand remains within the framework of the injunctive relief plaintiffs achieved. "Inasmuch as an injunctive decree is drafted in light of what the court believes will be the future course of events, a court must continually be willing to redraft the order at the request of the party who obtained equitable relief in order to insure that the decree accomplishes its intended result." 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2961, at 600 (1973) (emphasis added). Remand is not predicated on the perpetual supervision of the district court but preserves the Board's duty "to achieve the greatest possible degree of actual desegregation." Swann, 402 U.S. at 26, 91 S.Ct. at 1281.[57]
 
 
 87
 It is well to remember that the course we are running is a long one and the goal sought in the end--so often overlooked--is the best possible educational opportunity for all children. Communities deserve the freedom and the incentive to turn their attention and energies to this goal of quality education, free from protracted and debilitating battles over court-ordered student transportation.
 
 
 88
 Keyes, 413 U.S. at 253, 93 S.Ct. at 2719 (Powell, J. concurring in part, dissenting in part). Consistent with this goal, and with deliberate speed, the district court, on remand shall:1. Take evidence of plaintiffs' and defendants' alternatives to maintain racially balanced elementary schools within the framework of the changed circumstances that have occurred in the District;
 
 
 89
 2. Modify the Finger Plan to accommodate the changed circumstances;
 
 
 90
 3. In modifying the Finger Plan, assure that faculties achieve racial balance under the District's Affirmative Action Plan;
 
 
 91
 4. In a manner workable to the parties and the court, retain jurisdiction for a reasonable period of time to oversee the implementation and maintenance of these assignments.
 
 
 92
 The judgment of the district court is thus VACATED[58] and the case REMANDED for further proceedings to modify the 1972 decree consistent with this opinion.
 
 
 93
 BALDOCK, Circuit Judge, dissenting.
 
 
 94
 It is ironic that the capstone of this court's opinion is a quote from Justice Powell,[1] concerning the importance of securing quality education free from "protracted and debilitating battles over court-ordered student transportation." Keyes v. School Dist. No. 1, 413 U.S. 189, 253, 93 S.Ct. 2686, 2719, 37 L.Ed.2d 548 (1973) (Powell, J., concurring in part and dissenting in part); see Court's Opinion at 1505 (quoting same). Here, despite the school district's continued unitary status, this court retains jurisdiction and now orders the school district to racially balance the elementary schools which most certainly will require busing. Court's Opinion at 1506. The court also orders the school district to racially balance the elementary faculties. Id. The district court is to proceed "with deliberate speed." Id. at 1505. See W. Douglas, The Court Years 115 (1980) (discussing delay attributable to Justice Frankfurter's "all deliberate speed" language in Brown v. Board of Educ. (Brown II), 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955)).
 
 
 95
 Apparently, Justice Powell's view concerning transportation of elementary students was overlooked by this court. In fact, in the very next sentence of the passage relied upon by this court, Court's Opinion at 1505, Justice Powell expressed his disapproval: "The single most disruptive element in education today is the widespread use of compulsory transportation, especially at elementary grades." Keyes, 413 U.S. at 253, 93 S.Ct. at 2719 (Powell J., concurring in part and dissenting in part). He urged a return "to a more balanced evaluation of the recognized interests of our society in achieving desegregation with other educational and societal interests a community may legitimately assert." Id.; see also Columbus, 443 U.S. at 479, 486-87, 99 S.Ct. at 2991 (Powell, J., dissenting). Justice Powell's views concerning elementary transportation and other educational objectives, while perhaps not persuasive concerning an officially dual school system in 1973 when Keyes was decided, would seem to have greater force where, as here, a school system has achieved unitary status and seeks to enhance parental involvement, retain students and improve educational opportunity through a return to neighborhood schooling, only in grades 1-4, at the elementary level. The "more balanced evaluation" of educational and social objectives is precisely what is missing from this court's resolution of the case.
 
 I.
 
 96
 This court's opinion is faulty for three reasons: 1) improper reliance upon principles concerning the modification and termination of injunctions which are inapposite in the school desegregation context, 2) inadequate recognition of the legal effect of the school district's unitary status, and 3) insufficient deference to the factual findings of the district court concerning segregative intent.
 
 A.
 
 97
 This case arises in the unusual procedural context of the district court finding the school system unitary in 1977 and terminating jurisdiction of the case. The case was revived when the school district adopted a new student assignment plan, although a 1972 decree had not been lifted. In Dowell v. Board of Educ., 795 F.2d 1516 (10th Cir.), cert. denied, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986), this court determined that reopening the case was appropriate so that the plaintiffs would have an opportunity to be heard on the constitutionality of the plan. Id. at 1519.
 
 
 98
 Although Dowell did not express an opinion concerning the constitutionality of the neighborhood school plan at the elementary level, it cast the dispute in terms of injunction modification and termination law, and decided that a finding of unitariness does not alter the defendants' "duty to persist in the elimination of the vestiges of segregation." 795 F.2d at 1520. Of course, a finding of unitariness is inconsistent with remaining vestiges of state-imposed segregation (a constitutional violation), but in this case, the court adheres to its erroneous decision that "a finding of unitariness [does not] mandate the later dissolution of the decree without proof of a substantial change in circumstances which led to issuance of that decree." Court's Opinion at 1492.
 
 
 99
 Although the court in Dowell did not intend, even implicitly, to address the ultimate issue of constitutionality of the neighborhood school plan, 795 F.2d at 1523, the court framed the issue so as to give no practical effect to the 1977 unitariness finding. The school board retained the burden of proof that its conduct was not segregative; the plaintiffs only were required to prove that the 1972 decree had been violated. Id. In its opinion, the court has adopted that approach and has given no effect to the principle that "the differentiating factor between de jure and ... de facto segregation ... is purpose or intent to segregate." Keyes, 413 U.S. at 208, 93 S.Ct. at 2697 (emphasis in original). This case really turns on the responsibility of these defendants to ameliorate the effects of residential separation so often found in urban locations, including Oklahoma City.
 
 
 100
 It is beyond dispute that the school board cannot take actions intended to perpetuate or reestablish a dual school system. See Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979 (concerning student assignment, school construction and closings); Columbus, 443 U.S. 449, at 460, 99 S.Ct. 2941 at 2948, 61 L.Ed.2d 666 (concerning school construction and closings); Swann, 402 U.S. at 21, 91 S.Ct. at 1278 (same). Here, the school board deviated from the student assignment plan contained in the 1972 decree (grades 1-4) because the plan no longer was equitable and the board sought to improve the quality of elementary education. Although the school board should have proceeded to district court to have the 1972 decree dissolved, its apparent belief that the 1977 finding of unitariness dissolved the decree was certainly understandable given the state of the law at the time. In any event, we now consider whether the 1972 decree should be enforced or modified. Court's Opinion at 1487.
 
 
 101
 At the hearing below, both parties sought to modify the district court's 1972 decree requiring implementation of the Finger Plan. The defendants sought to retain their neighborhood school plan at the elementary level. The plaintiffs sought to eliminate, at least in part, the neighborhood school plan and substitute in its place a new plan, prepared by Dr. Gordon Foster, which involved pairing and clustering schools and changing the grade structure of several elementary schools. The plaintiffs contended that the proposed plan was consistent with the 1972 decree, which they maintained had become inequitable, and they contended that the proposed plan was better than the neighborhood school plan. See rec. vol. I, doc. 17, app. A (final pretrial order--plaintiffs' contentions).
 
 
 102
 Because the school district had attained and maintained unitary status, plaintiffs were required to demonstrate that the district had lost its unitary status through purposefully segregative school board actions. When the entirety of Supreme Court desegregation precedent is applied in the context of a unitary school district, I do not agree with this court that the findings of the district court are clearly erroneous. Rather those findings are supported by the record and merely reflect the district court's choice among expert and lay testimony, which at times conflicted, concerning direct and circumstantial evidence of segregative intent.
 
 
 103
 Moreover, I question retention of jurisdiction in this case given the unitary status of the school district. Four other circuits hold that current desegregation law does not envision continued federal jurisdiction in the affairs of local school districts in perpetuity once a school district becomes unitary. See United States v. Overton, 834 F.2d 1171, 1176, 1174-77 (5th Cir.1987) ("We see Dowell's effort to declare a school district to be unitary while retaining jurisdiction as an illusion that denies the essence of unitariness.") (Higginbotham, J.); Morgan v. Nucci, 831 F.2d 313, 318 (1st Cir.1987) ("Although the [Supreme] Court has produced no formula for recognizing a unitary school system, the one thing certain about unitariness is its consequences: the mandatory devolution of power to local authorities."); Riddick v. School Bd., 784 F.2d 521, 535, 534-39 (4th Cir.1986); ("[O]nce the goal of a unitary school system is achieved, the district court's role ends."); Vaughns v. Board of Educ., 758 F.2d 983, 988 (4th Cir.1985) ("A district court's jurisdiction to grant further relief in school desegregation cases in not perpetual.... Once a school system has achieved unitary status, a court may not order further relief to counteract resegregation that does not result from the school system's intentionally discriminatory acts."); Spangler v. Pasadena Bd. of Educ., 611 F.2d 1239, 1241 (9th Cir.1979); Id. at 1247 ("Retention of jurisdiction when there is no longer a demonstrated need to monitor compliance may defeat important governmental and personal interests.... There is no warrant for retaining further jurisdiction in the case, and the district court should enter an order relinquishing all further jurisdiction.") (Kennedy, J., concurring);[2] but see United States v. Board of Educ., 794 F.2d 1541, 1543 (11th Cir.1986) (per curiam) (when parties have relied on desegregation orders to make commitment to start desegregation process, it may be inappropriate to vacate such orders even after unitary status attained). Contra Dowell, 795 F.2d at 1516 (10th Cir.). This court's "semantic recasting of unitary status," Overton, 834 F.2d at 1176, in terms of prohibitory injunction law aimed at private parties and relief from judgment, Fed.R.Civ.P. 60(b), displaces the concept of unitary status and insures federal involvement, even in the absence of a constitutional violation.
 
 
 104
 To impose onerous duties on the school board, this court improperly relies upon desegregation passages involving dual systems charged with the affirmative duty to eradicate de jure segregation and its vestiges. See, e.g., Court's Opinion at 1499 (relying upon Swann 's quotation of Green v. County School Bd, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), 402 U.S. at 13, 91 S.Ct. at 1274, for affirmative duty); Court's Opinion at 1503 (relying upon Swann, 402 U.S. at 28, 91 S.Ct. at 1282, for discussion of neutral assignment plans which may not be compatible with affirmative duty); Court's Opinion at 1503 (relying upon Davis v. Board of School Comm'rs, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971), for concept that desegregation plan must be effective, given remedial responsibility of local board); Court's Opinion at 1493, 1504-05 (relying upon Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979, concerning board's affirmative duty not to perpetuate or reestablish dual school system and the heavy burden the board faces in explaining actions not consistent with the affirmative duty). We have a very different situation in this case--this board has met its affirmative duty and no longer is under "an unsatisfied duty to liquidate a dual system." See Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979.
 
 
 105
 Under any test in which segregative intent is relevant, I cannot agree that the neighborhood school plan for the elementary grades 1-4 had "the effect of making the District 'un -unitary' by reviving the effects of past discrimination." Court's Opinion at 1499 (emphasis in original); see also id. at 1504 ("the Plan restores the effects of past discriminatory intent remedied by the decree") (emphasis in original).[3] Of course, the word "un-unitary" seems unnecessary in the lexicon of school desegregation law; an "un-unitary" system is a dual system, and the inquiry here is whether the neighborhood school plan signals the return of a dual system. This court overturns the district court's decision to dissolve the injunction implementing the 1972 desegregation plan for two reasons: 1) because the district court "failed to address or distinguish plaintiffs' contrary evidence," and 2) because the district court "cast the evidence on which it relied in a form to provide an answer to the single question of discriminatory intent...." Id. at 1504. Both reasons given by this court are wanting.
 
 B.
 
 106
 Under Fed.R.Civ.P. 52(a) and Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), we are not at liberty to reverse the district court's factual findings unless they are clearly erroneous. Where, as here, "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. Admittedly, the failure to address truly contrary evidence may leave the door open for the court of appeals to find internal inconsistencies or implausibility in the evidence relied upon, see id. at 575, 105 S.Ct. at 1512, but the ultimate inquiry is whether the "district court's account of the evidence is plausible in light of the record viewed in its entirety." Id. at 574, 105 S.Ct. at 1511. Considering what issues are material in this lawsuit, I would affirm the district court. There is ample evidence to support the finding that, even with the introduction of a neighborhood school plan in grades 1-4, the school board still operates a unitary system.
 
 
 107
 One of the most serious technical problems with this court's decision is the methodology of identifying racially disproportionate schools after implementation of the neighborhood plan. This court claims that 32 out of 64, or one-half, of the elementary schools are now "one-race majority schools." Court's Opinion at 1493, 1497, 1502. We are told that only "[t]hirty-two elementary schools remained racially mixed." Id. at 1487. This analysis is flawed. The district court properly was concerned with the emergence of 90+ black schools as a result of the neighborhood plan. Dowell v. Bd. of Educ., 677 F.Supp. 1503, 1509-10 (W.D.Okla.1987). Here, this court correctly notes that 11 out of 64 elementary schools are 90% + black after the plan. Court's Opinion at 1486-87. But then the court adds to the number of racially disproportionate schools by deciding that if a school has less than 10.7% black enrollment, it is not racially mixed, regardless of the presence of other minorities. See id. at 1487, 1487 n. 2. A significant portion of the data in this case only distinguished between black students and other students.[4]While such date clearly indicates concentration of black students,[5] such an approach fails to recognize the presence of other minorities which increased since 1972; in 1985-86, non-black minorities comprised 13.3% of the elementary system enrollment (Hispanic, 6.8%; Native American, 4.2%; Asian-American, 2.3%). See Dowell, 677 F.Supp. at 1510; def. ex. 63, reproduced in Appellees' Addendum to Brief.
 
 
 108
 This is a school district in which the elementary students are 50.7% white, 36.0% black and 13.3% other minority (total minority percentage of 49.3). Dowell, 677 F.Supp. at 1510 (1985-86). If we compare the white enrollment with the aggregated number of minority students as is appropriate under Keyes, 413 U.S. at 197-98, 93 S.Ct. at 2691-92; see also Riddick, 784 F.2d at 527 n. 7 (minority percentage aggregated, not expressed solely in terms of black enrollment), and as was done by the district court, 677 F.Supp. at 1509-10, the 21 extra schools identified by this court range from 13.8% (Lafayette) to 58.5% (Willard) minority enrollment--these extra 21 schools are not one-race schools, even if they do not contain the system-wide average (40%) of black students.[6] Indeed, some of these schools approach the elementary system-wide minority percentage, e.g. Lee, 44.5% minority; Willard, 58.5%. Insofar as the permissible inference of segregative intent is concerned, the 21 schools identified by this court simply do not have the same implications as the eleven 90%+ black schools.[7] This is true notwithstanding Dr. Finger's reluctance to agree that schools which have more than 10% minority enrollment, but less than 10% black enrollment, are not segregated white schools. See Court's Opinion at 1496.
 
 
 109
 Indeed, one of the limitations of the 1972 Finger Plan is that it sought racial balance only with respect to black students. Rec. vol. III at 321. Dr. Biscoe, school administrator, was aware of this feature and testified that notwithstanding, it is important to look at total minority percentages, not just black, when evaluating the district. She said:
 
 
 110
 Since I work a lot with federal programs and attend a lot of those meetings, as I've gone around the country one thing I've noticed that happens in many of the school districts is that people look at the percent of minority students in their district, including Orientals, Native American students, Hispanic students.
 
 
 111
 Of course[,] if you look at our district in terms of total minority population as compared to white population, you get a totally different picture than if you just look at those data black-white.
 
 
 112
 Id. The district court correctly decided to aggregate minority percentages when reviewing the effects of the neighborhood plan.
 
 
 113
 Although the district court is criticized for its finding concerning intent, Court's Opinion at 1504, it is apparent that this court is merely reweighing the evidence and crediting the circumstantial evidence of segregative intent--namely the emergence of one-race schools. See id. at 1502-04. Of course, reweighing the evidence is not consistent with our appellate function. See 5A J. Moore & J. Lucas, Moore's Federal Practice, p 52.03 (1989). This court is under the mistaken impression that circumstantial evidence of segregative intent must be preferred in these types of cases. See Court's Opinion at 1503 (quoting Keyes v. School Dist. No. 1, 670 F.Supp. 1513, 1516 (D.Colo.1987), appeal pending, Nos. 85-2814 & 87-2634 (10th Cir. submitted Jan. 17, 1989).[8] Despite the court's contrary conclusion, the district court properly weighed all of the evidence and came to a permissible conclusion that there was an absence of segregative intent necessary support a constitutional violation.
 
 C.
 
 114
 Another obvious problem with the court's resolution of this case is its reliance upon general principles concerning the modification of injunctions when principles specifically concerning the process of desegregation have been enunciated by the Supreme Court. This court relies upon the standard of United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), an antitrust case, for the proposition that, despite unitariness, the school board must show that the condition the injunction was designed to protect against has abated and the failure to modify the injunction will result in extreme hardship to the school board. Court's Opinion at 1489-91. It is not enough that the constitutional violation has been remedied. Id. at 1490-91 ("The condition that eventuates as a function of the injunction cannot alone become the basis for altering the decree absent the Swift showing."). This court severs the integral link between the desegregation decree and an extant constitutional violation contending that " 'an injunction takes on a life of its own and becomes an edict quite independent of the law it is meant of effectuate.' " Id. at 1490 (quoting T. Jost, From Swift to Stotts and Beyond: Modification of Injunctions in the Federal Courts, 64 Tex.L.Rev. 1101, 1105 (1986)). How ridiculous that an injunction, meant to effectuate the law, "becomes an edict quite independent of the law it is meant to effectuate." See id.II.
 
 
 115
 Given the court's position on insuring prospective relief even in the absence of a constitutional violation, unitariness is not a bar to reconsideration of the decree. Court's Opinion at 1491. The court tempers its reliance on the exacting standard required for modification of injunctions by citing the dissenting portion (without so indicating) of Judge Higginbotham's opinion in United States v. Lawrence County School Dist., 799 F.2d 1031, 1056 (5th Cir.1986) ("By its forward cast, an injunction contemplates change and thus must be sufficiently malleable to adapt the ordered relief to contemporary circumstances.") (Higginbotham J., concurring in part and dissenting in part). See Court's Opinion at 1491; see also Pasadena Bd. of Educ. v. Spangler, 427 U.S. 424, 437, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976) (recognizing propriety of modification when there is continuing supervision). Moreover, Judge Higginbotham, writing for a unanimous panel, quite firmly has rejected this court's approach in Dowell. Overton, 834 F.2d at 1174-77.
 
 
 116
 Swift simply does not apply to the vast majority of desegregation decrees. In Spangler v. Pasadena Bd. of Educ., Justice (then Judge) Kennedy explained the inapplicability of Swift to a district court's termination of equitable jurisdiction in school desegregation cases. Spangler, 611 F.2d at 1245 n. 5.
 
 
 117
 Swift involved the efforts of antitrust defendants who had entered into a consent decree prohibiting anticompetitive actions to modify the decree by lifting some of its prohibitions. It is doubtful the case supports the district court's retention of jurisdiction. Swift establishes general criteria for dissolution or modification of prohibitory injunctions against private wrongdoers. More recent Supreme Court desegregation decisions have established specific criteria for dissolution of regulatory injunctions imposed upon public school authorities ... [T]hese criteria recognize (1) that the proper function of a school desegregation decree is remedial, and (2) necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination. See Milliken v. Bradley [Milliken II ], ... 433 U.S. [267,] at 280-82, 97 S.Ct. 2749, 2757-58, 53 L.Ed.2d 745 [ (1977) ].
 
 
 118
 Id. Justice Kennedy's reasoning is equally applicable to this court's retention in perpetuity of equitable jurisdiction over a unitary system, using the desegregation decree as the vehicle.
 
 
 119
 Virtually all of the cases relied upon by this court in its application of Swift involve unsuccessful attempts to obtain, modify or dissolve injunctions which forbid or limit private commercial conduct; in the main, they concern prohibitory private injunctions. See Court's Opinion at 1489-91; SEC v. Blinder, Robinson & Co., 855 F.2d 677, 679-80 (10th Cir.1988) (declining to vacate injunction prohibiting securities firm from engaging in deceptive practices), cert. denied, --- U.S. ----, 109 S.Ct. 1172, 103 L.Ed.2d 230 (1989); EEOC v. Safeway Stores, Inc., 611 F.2d 795, 797-98, 799 n. 7 (10th Cir.1979) (Title VII consent decree not modified), cert. denied, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980); SEC v. Thermodynamics, Inc., 464 F.2d 457, 458 (10th Cir.1972) (declining to modify injunction prohibiting individual from violating registration and antifraud provisions of 1933 Act), cert. denied, 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 588 (1973); SEC v. Jan-Dal Oil & Gas, Inc., 433 F.2d 304, 305 (10th Cir.1970) (reinstating injunction prohibiting company and individual from selling mineral interests or any other security in violation of 1933 Act); Humble Oil & Refining Co. v. American Oil Co., 405 F.2d 803, 807 n. 1 (8th Cir.) (declining to modify injunction prohibiting energy company from using trademark or trade name), cert. denied, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969); but see United States v. W.T. Grant Co., 345 U.S. 629, 630, 73 S.Ct. 894, 896, 97 L.Ed. 1303 (1953) (affirming denial of injunction).
 
 
 120
 The one case concerning a public injunction relied upon by this court is Battle v. Anderson, 708 F.2d 1523 (10th Cir.1983) (McKay, J. & Doyle J.), cert. dismissed, 465 U.S. 1014, 104 S.Ct. 1019, 79 L.Ed.2d 248 (1984). The case involved the district court's jurisdiction to require prison authorities to submit: 1) a policy statement, and 2) a plan to avoid a return to unconstitutional prison conditions, and indicate when compliance with an earlier stipulation concerning prison conditions could be expected. Id. at 1540. This court understood that the district court order was "limited in scope and ... targeted to assure compliance with past decrees and to prevent a recurrence of unconstitutional conditions." Id. The school desegregation cases were cited as authority for the court's decision. Id. at 1538, 1538 n. 3.
 
 
 121
 Under the Swift standard it is "virtually impossible" to vacate or modify an injunction when the beneficiary of the injunction does not consent. SEC v. Blinder, Robinson & Co., 855 F.2d at 679. Thus, from a practical perspective, the Swift line of cases are ill-suited for deciding when a desegregation decree should be terminated or modified on motion of a school board. Desegregation decrees are primarily mandatory injunctions, rather than prohibitory injunctions, and involve complex affirmative commands often concerning student and faculty/staff assignment. See D. Dobbs, Handbook on the Law of Remedies, Sec. 2.10 at 105 (1973). As the volume of litigation indicates, the framing and enforcement of a desegregation decree is more complex than merely prohibiting an act.
 
 
 122
 Another reason why the Swift line of cases is inappropriate is that desegregation decrees are not designed to operate over several decades. See Court's Opinion at 1491 n. 12 (noting Swift decrees were in effect for 76 years). As Dr. Finger testified in this trial, he would have expected that his 1972 plan "would have been quite extensively modified." Rec. vol. VIII at 1198. For example, he did not expect that the fifth-year centers would be retained, but rather would have been incorporated into the middle schools. Rec. vol. VIII at 1198-99. Nor did he expect that there would be resistance to "stand-alone" schools, for one of the traditional objectives of desegregation planning is "to make as many naturally desegregated schools as you can make." Id. at 1200.
 
 
 123
 Dr. Finger's testimony underscores why compliance to the letter with a desegregation decree over an unlimited time span would be inappropriate. In explaining his reaction to the unexpected retention of the fifth-year centers contained in his 1972 plan, he said:
 
 
 124
 [A] lot of things happened ... that people didn't anticipate, ... that our cities would become more minority, that birth rates would change, that the ... number of white children in cities would change. A lot of things have happened since 1972. The world today is not the same as it was in 1972, ... and very drastic changes have taken place, and I ... know its been difficult for the school board and the school department to contend with all these differences that occurred, ... and I can see that these decisions are really tough.
 
 
 125
 Id. at 1199. A school district does not have the luxury of ignoring change; it is part of a dynamic system continually confronted by demographic and social forces not of its own making. See Swann, 402 U.S. at 31-32, 91 S.Ct. at 1283-84. The Swift standard has been applied in the context of terminating antitrust injunctions, or other commercial injunctions between private parties. Applying the Swift standard to the modification or termination of school desegregation orders is unwarranted and impractical.
 
 
 126
 From the beginning, the Supreme Court recognized the need for "practical flexibility" in "effectuat[ing] a transition to a racially nondiscriminatory school system." Brown II, 349 U.S. at 300-01, 75 S.Ct. at 756-57. The Court also recognized the need for continued oversight and adjustment during this period. Id.; Green, 391 U.S. at 439, 88 S.Ct. at 1694 (continued evaluation by district court needed). In the remedial phase, the Court has insisted upon flexibility, see, e.g., Swann 402 U.S. at 28, 91 S.Ct. at 1282, which is inconsistent with the fixed nature of the relief generally founded in cases following Swift. Indeed, at the conclusion of its opinion, this court recognizes the need for continual redrafting of desegregation decrees, but only for the plaintiffs in school desegregation litigation, not for the defendants. Court's Opinion at 1505; see also id. at 1490 n. 11 (relying upon United States v. United Shoe Mach. Corp., 391 U.S. 244, 248-49, 88 S.Ct. 1496, 1499-1500, 20 L.Ed.2d 562 (1968)).[9] Despite this court's protestations to the contrary in its revised opinion, Court's Opinion at 1505 n. 57, the standard it adopts for modification of desegregation decrees at the request of defendants is far more difficult than the standard for plaintiffs.
 
 III.
 
 127
 In deciding whether a desegregation decree should take on a life of its own after unitary status has been achieved, it is well to keep in mind the purpose of and criteria for the design of equitable relief in the remedial phase of school desegregation cases. The purpose of the relief is to eliminate an unconstitutional dual school system and its vestiges arising from state-imposed segregation. Swann, 402 U.S. at 15, 28, 91 S.Ct. at 1275, 1282. In devising a remedy, three factors predominate: 1) the nature and scope of the constitutional violation determines the remedy, Swann, 402 U.S. at 16, 91 S.Ct. at 1276; see also Pasadena, 427 U.S. at 434, 96 S.Ct. at 2703; Milliken v. Bradley (Milliken I), 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974), 2) the decree must be remedial, designed to restore the victims of discriminatory conduct to the position that they would have been in had the discriminatory conduct not occurred, Milliken I, 418 U.S. at 746, 94 S.Ct. at 3128, and, 3) the district court must consider the value of state and local control of public education, Dayton I, 433 U.S. at 410, 97 S.Ct. at 2770. Milliken II, 433 U.S. at 280-81, 97 S.Ct. at 2757. Of course, local school district boundaries and policies must be set aside if they conflict with the dictates of the fourteenth amendment. Milliken I, 418 U.S. at 744, 94 S.Ct. at 3126. But in this case, all of the above factors have not been applied; instead a new long-term remedy has been imposed under the guise of an extension of the old, without due regard for the restitutionary purpose of a desegregation remedy and the importance of local control. This comes as no surprise because the court "approach[es] this case not so much as one dealing with desegregation, but as one dealing with the proper application of the federal law on injunctive remedies." Court's Opinion at 1486, but see id. at 1493 n. 19 ("[O]ur focus is upon the issue of desegregation.").
 
 
 128
 The Supreme Court's desegregation cases suggest that a district court's jurisdiction is finite and that the decree does not survive the termination of jurisdiction. The Court envisioned a "period of transition" "to a racially nondiscriminatory school system." Brown II, 349 U.S. at 301, 75 S.Ct. at 756. A "transition" is defined as "a passage or movement from one state, condition, or place to another." Webster's Third New Int'l Dictionary at 2428 (1981). In Green, the Supreme Court spoke of "convert[ing] to a unitary system" and "retain[ing] jurisdiction until it is clear that state-imposed segregation has been completely removed." 391 U.S. at 438-39, 88 S.Ct. at 1694-95. The goal was "to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools." Id. at 442, 88 S.Ct. at 1696. In Raney v. Board of Educ. 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), decided the same day as Green, the Court held that rather than dismissing a desegregation complaint, a district court should "retain jurisdiction until it is clear that disestablishment had been achieved." Id. at 449, 88 S.Ct. at 1700.
 
 
 129
 In Swann, Chief Justice Burger, writing for a unanimous Court, indicated that the role of the federal court would end at some time. 402 U.S. at 31-32, 91 S.Ct. at 1283-84. The Court further recognized that the school desegregation cases are not the appropriate vehicle for alleviating the effects of other private or public action which might result in segregation.
 
 
 130
 We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious or ethnic grounds.... The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage. It would not serve the important objective of Brown I to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination.
 
 
 131
 Swann, 402 U.S. at 22-23, 91 S.Ct. at 1279. Although that the Court did not address other state action which might contribute to disproportionate racial concentrations in some schools, id. at 23, 91 S.Ct. at 1279-80, the Court discussed limitations on federal equitable power and said:
 
 
 132
 At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in Brown I. The systems would then be "unitary" in the sense required by our decisions in Green and Alexander.
 
 
 133
 It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.
 
 
 134
 Id. at 31-32, 91 S.Ct. at 128384.[10] This suggests that a desegregation decree does not have an unlimited life, once the constitutional violation is remedied. This view is consistent with the Court's earlier comment that "[a]bsent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis." Id. at 28, 91 S.Ct. at 1282. Nevertheless, this court's command for racial balancing is judicially ordered assignment in the absence of a constitutional violation. It is notable that the Court did not hold that the district court could deal with future problems after unitary status by relying upon a violation of the last injunctive decree; rather, the district court can fashion a remedy based upon current conditions, or upon a showing of purposeful resegregation, a constitutional violation.
 
 
 135
 In Pasadena, the Supreme Court held that once a desegregation plan concerning student assignment had achieved its objectives, and no showing is made of intentionally segregative actions by the school board, the district court's role in student assignment comes to an end. 427 U.S. at 435-37, 96 S.Ct. at 2704-05. This court distinguished Pasadena in Dowell as a case in which "an aggrieved party sought remedial relief in addition to the previous decree." 795 F.2d at 1522. But in Pasadena, the school board, "requested the District Court to dissolve its injunctive order requiring that there be no school in the [district] with a majority of any minority students enrolled." Pasadena, 427 U.S. at 431, 96 S.Ct. at 2702; see also id. at 428-29, 96 S.Ct. at 2701 (setting out relief requested by school board); Spangler v. Pasadena Bd. of Educ., 375 F.Supp. 1304, 1305 (C.D.Cal.1974) (relief sought by school board), aff'd, 519 F.2d 430 (9th Cir.1975), vacated and remanded, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). Thus, contrary to this court's assumption, Pasadena was not a case "in which an aggrieved party sought remedial relief in addition to the previous decree" or "an attempt to achieve further desegregation based upon minor demographic changes not 'chargeable' to the board." See Dowell, 795 F.2d at 1522. The court's characterization is understandable only if compliance with the plan is viewed as an attempt to achieve further desegregation.
 
 
 136
 The court in Dowell also suggested that Pasadena was explainable in terms of "minor shifts in demographics or minor changes in other circumstances which are not the result of an intentional and racially motivated scheme to avoid the consequences of a mandatory injunction...." 795 F.2d at 1522. The court then contrasted this case with Pasadena because this case involves abandoning the 1972 desegregation plan in favor of a plan "which appears to have the same segregative effect as the attendance plan which generated the original lawsuit." Id. (emphasis in original).
 
 
 137
 The rationale of Pasadena and Swann consistently address the limits of federal equitable power when unitariness has been attained and the constitutional violation abated. The result of Pasadena turns, not upon the size of the racial imbalance or demographic shift, but rather, upon whether the school district engineered an unconstitutional separation after achieving unitariness with respect to student assignment. 427 U.S. at 434, 96 S.Ct. at 2703.
 
 
 138
 A dispassioned reading of Pasadena also seriously undercuts this court's view that the 90%+ black schools in this case are ipso facto an effect of past discriminatory intent. See Court's Opinion at 1504. In Pasadena, 5 out of 32 schools had majority black student enrollments just four years after the 1970 decree implementing the desegregation plan. 427 U.S. at 431, 96 S.Ct. at 2702. Yet, because the school board was not responsible for creating this situation, readjustment was not necessary. Attendance areas could be left as they were. Finally, Pasadena made it clear that a school system can be unitary with respect to student assignment, even if it is not with respect to faculty/staff assignment. Id. at 436, 96 S.Ct. at 2704.
 
 IV.
 
 139
 Resuscitating the 1972 decree in this case has the effect of vitiating any benefits of unitary status for the school district. As noted by the Fifth Circuit:
 
 
 140
 The difficulty with Dowell 's approach is that it denies meaning to unitariness by failing ever to end the judicial superintendence of schools. Of course, school districts cannot escape the duty to maintain their school systems in conformity with the Constitution. Attaining unitary status, however, means that a school board is free to act without federal supervision so long as the board does not purposefully discriminate; only intentional discrimination violates the Constitution. As we have said, a school district is released from the consequences of its past misdeeds when it eliminates the vestiges of a segregated system and achieves a true unitary system.
 
 
 141
 Overton, 834 F.2d at 1175 (footnote omitted). Redemption is not the hallmark of this court's approach, but there are several other reasons why the approach of Dowell as realized in this case, is not in keeping with the mechanics of school desegregation litigation.
 
 
 142
 Most critical is the burden of proof. Without question, this court today has placed upon the unitary school district the same burden it would have, had it operated a statutorily or officially dual school system yesterday. This court's first error is in assuming that certain concepts associated with becoming unitary such as "affirmative duty" and "maximum practicable desegregation," Court's Opinion at 1493, have equal relevance once the district has attained and maintained unitary status. This court reasons that once the plaintiffs have shown that the injunction has not been complied with, here because of the emergence of the inflated 32 out of 64 "one-race majority" schools, see supra p. 1510-13, the defendants have the burden of showing "changed circumstances or oppressive hardship." Court's Opinion at 1493.
 
 
 143
 What this means is that the school board is put back at the "proverbial first square." See id. at 1491. Indeed, in its discussion of the burden of proof, this court resurrects two presumptions: one applies when a prima facie case of intentional segregation by school authorities has been proven; the other applies once a system-wide violation has been established and a remedy is being implemented. Court's Opinion at 1492-93; see also Dowell v. Board of Educ., 465 F.2d 1012, 1014 (10th Cir.) (presumptions applied to Oklahoma system), cert. denied, 409 U.S. 1041, 93 S.Ct. 526, 34 L.Ed.2d 490 (1972). This court relies upon Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979, as quoted in Clark v. Board of Educ., 705 F.2d 265, 271 (8th Cir.1983)[11] for the presumption that actions which increase or continue the effects of a dual system are inconsistent with a school board's affirmative duty to liquidate that system, and that the board faces a heavy burden in providing an explanation for such actions. See Court's Opinion at 1493. The court also discusses the Swann presumption against one-race schools, 402 U.S. at 26, 91 S.Ct. at 1281, in the remedial phase of desegregation litigation.
 
 
 144
 To understand the problems with this court's approach, it is necessary to understand how the burden of proof is allocated before a school district becomes unitary. In a system that was statutorily or officially dual, plaintiffs may establish the prima facie case by proving that there is a current condition of intentional segregation; that the de jure system or its vestiges remain or were reestablished in part of the school system. Columbus, 443 U.S. at 463-68, 99 S.Ct. at 2949-52. Even an isolated condition of current intentional segregation would violate the affirmative duty to eliminate the dual system and its vestiges and to convert to a unitary system in which racial discrimination is eradicated. Dayton II, 443 U.S. at 537, 99 S.Ct. at 2979; Columbus, 443 U.S. at 459, 99 S.Ct. at 2947; see also L. Tribe, American Constitutional Law 1498-1500 (2d ed. 1988) (discussing Supreme Court school desegregation cases).
 
 
 145
 That critical finding shifts the burden of proof to the defendants because it provides "a sufficient basis for an inferential finding of systemwide discriminatory intent," which in turn will be applied to explain "racial separation in other parts of the school system." Columbus, 443 U.S. at 467-68, 99 S.Ct. at 2951-52. At that point, the school defendants must come forward with "proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions." Keyes, 413 U.S. at 210, 93 S.Ct. at 2698. If intent cannot be disproved, the defendants must show that their "past segregative acts did not create or contribute to the current segregated condition," in other parts of the system. Id. at 211, 93 S.Ct. at 2699. Before a determination of unitariness, the "board has a 'heavy burden' of showing that actions that increased or continued the effects of the dual system serve important and legitimate ends." Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979.
 
 
 146
 To summarize, "once a court has found an unlawful dual school system, the plaintiffs are entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests upon the defendants." School Bd. v. Baliles, 829 F.2d 1308, 1311 (4th Cir.1987). Where, as here, the system has achieved unitariness, the presumption ends. Id.; see also Riddick, 784 F.2d at 543.
 
 
 147
 But in this case, the court not only has failed to terminate the presumptions which resulted in the 1972 decree, but also has added new burdens for the school board. Now, the school board must bear the same burden it was under when discharging its affirmative duty to liquidate a dual school system, and it must also demonstrate that deviating from the 1972 decree would result in such extreme and unexpected hardship as to render the decree oppressive. See Court's Opinion at 1493. According to the court, the school board was required to meet its evidentiary burden "by clear and convincing evidence." Court's Opinion at 1491. It is easy to understand why concerns with educational effectiveness, parental involvement, student retention and the inconvenience of forced transportation pale in comparison to such a draconian standard.
 
 
 148
 Thus, I cannot agree with the court that the school district's "burden is not alleviated after a finding of unitariness when the decree remains in place." Id. at 1493. As noted by the Fifth Circuit, it matters little whether we call it "maintenance of a decree or dispensing with proof of purpose or shifting the burden of proof" because the effect is the same: federal judicial power displacing local control long after schools which were once part of a dual system are "just schools" in a unitary system. Overton, 834 F.2d at 1176. Rejecting the argument that a unitary school district must continue with a burden to prove continually that its decisions are free of segregative purpose, the Fifth Circuit commented upon the relationship between unitary status and the school district's burden of proof.
 
 
 149
 The elements of a violation and who must bear the burden of proof are not conceptually distinct from unitary status but are its components; indeed, the contrary assertion is dissembling. In the real world of trial and uncertain proofs, a perpetual placement upon a school board of the burden of persuading its innocence of conduct with segregative impact differs little in effect from the superintendence that attends an extant decree and pending suit.
 
 
 150
 Id. at 1176. The acknowledgment of the school district's unitary status, Dowell, 795 F.2d 1522; Court's Opinion at 1486, 1499, while requiring the school board to retain the burden of proof (and presumptions against it) in addition to the additional burden of meeting the Swift criteria for modifying a decree, proves too much. It not only "denies the essence of unitariness," but may very well impose greater substantive burdens on the school board than before the unitariness finding. See Overton, 834 F.2d at 1176.
 
 
 151
 In its amicus brief, the United States argues that the continuation of the court's jurisdiction in this case via the 1972 decree was inappropriate because of the successful dismantling of the dual school system as signified by unitary status. United States' Brief at 5. This court responded that it "was unwilling to revise Rule 60(b) to accommodate this position." Court's Opinion at 1499 n. 41. Rule 60(b) would hardly need revision to accommodate the legal consequences of a determination of unitary status. The court then rejects the government's argument that "[e]ven if sustained compliance with the plan is not dispositive in the unitariness inquiry, it is entitled to great weight and should create at least a presumption of unitary status," United States' Brief at 9 (emphasis in original). Court's Opinion at 1499 n. 41. While there is a difference between a presumption and relevant evidence, one would expect that sustained compliance with a plan would be highly relevant evidence in a unitariness inquiry.
 
 
 152
 Indeed, this court just above said that "the good faith of the school officials in the desegregation effort" was a unitariness[12] factor. Court's Opinion at 1499. See Brown v. Board of Educ., No. 87-1668, slip op. at 25 (10th Cir. filed Jun. 2, 1989 & withdrawn Jul. 19, 1989); Morgan, 831 F.2d at 321 (good-faith compliance with court's plan is a factor in deciding unitariness);[13] Ross v. Indep. School Dist., 699 F.2d 218, 226 (5th Cir.1983) (court considered "good-faith efforts to dismantle the dual school system" and declared system unitary).[14]
 
 
 153
 In justifying its approach, this court explains that it is concerned with the future value of an injunction, not with "fix[ing] for all time equitable relief mandated by constitutional considerations on the basis of present conditions." Court's Opinion at 1499 n. 41. The court reasons that "[t]he extension of the government's theory portends minority citizens have no assurance of any but short-term and pyrrhic victories." Id.
 
 
 154
 However, during the period in which the constitutional violation is being remedied, a federal court is empowered to make changes in the equitable decree. The relief is not "fixe[d] for all time." Moreover, this court's concern with the absence of a remedy for minority citizens undervalues the force of 35 years of desegregation cases and the alacrity with which a fresh judicial remedy can be imposed upon a showing of purposeful discriminatory action taken by the school board.
 
 
 155
 In an effort to limit its holding, this court tells us in its revised opinion that it is merely relying upon the district court's power to enforce its equitable remedy, which "does not die until the remedy expires." Court's Opinion at 1492 n. 17. The problem with this analysis is that a remedy imposed and enforced by a court to correct racial discrimination should expire once the condition which offends the Constitution is alleviated. Overton, 834 F.2d at 1176. This court states that its holding is limited because the district court will cease active supervision upon a finding of unitariness, and the district court "retain[s] post-remedy authority over a school district" only "to enforce, modify, or vacate its decree." Court's Opinion at 1492 n. 17. This construct is pure sophistry. The school district will operate under a court-imposed decree, and the parties will have to repair to federal court to get the decree changed. The earlier finding of unitariness in no way lessens the obligation: the district court will never cease active supervision.
 
 
 156
 This court's laudable purpose for retaining jurisdiction is embedded in an unfortunate rationale which assumes that the arduous gains in racial equality will be lost should the school board be freed of federal control. The Fifth Circuit has addressed the same argument, rejecting the rationale of Dowell, 795 F.2d at 1516:
 
 
 157
 The argument's essence is that school districts that have intentionally discriminated are not to be trusted with the freedom of the Constitution. It rests upon a fear that the fourteenth amendment, proscribing as it does only purposeful discrimination, inadequately protects desegregation gains, at least at the hands of a former wrongdoer.
 
 
 158
 We are not persuaded. Whatever the power of Congress to so circumscribe the freedom of state actors, such as not requiring proof of purposeful discrimination in employment, the contended for judicial rule is here a heady call for raw judicial power. It is not that we deny the risk; the risk of wrong decision is inherent in the freedom to choose, and we are not so naive as to believe that we are no longer vulnerable to racism, if such insights are to overtly inform our judgment.
 
 
 159
 Overton, 834 F.2d at 1176. Though there be a risk, it is a risk which must be taken if ever a local school system is to function independently.
 
 
 160
 It might appear that this court's perpetual supervision of the school board has been vindicated here, because the school board, incorrectly believing it was free of federal control, enacted a neighborhood school plan which resulted in 11 out of 64 schools having a virtually one-race and black enrollment. However, as discussed below, the district court considered and rejected this circumstantial evidence of segregative intent, given the golconda of contrary evidence offered by the school board. Significantly, the school board has retained elements of the Finger Plan at all but the elementary level (1-4), and has taken other steps which certainly suggest an absence of segregative intent. Approximate racial balance is retained through busing in grades 5-12. The district court's decision rests upon ample evidence; the points raised by this court go to the weight of the evidence, not its sufficiency.
 
 V.
 
 161
 Apart from the clearly erroneous standard which governs our review of the district court's factual findings concerning unitariness, Riddick, 784 F.2d at 533, it is important to understand the importance of intent. After informing us that once a decree is in place, "the intent of the defendants has little, if any, relevance," Court's Opinion at 1491, the court devotes a significant portion of its opinion to discussing intent. See Court's Opinion at 1502-04.
 
 
 162
 The lifting of the decree should be the natural result of attaining unitary status. Thereafter, the basis for a system-wide remedy should be another intentional violation of the Constitution by school officials. The district court found that the only evidence which was indicative of segregative intent was disproportionate impact upon some black students. Dowell, 677 F.Supp. at 1517. The district court, relying on Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), and Dayton II, 443 U.S. at 536 n. 9, 99 S.Ct. at 2978 n. 9, declined to find segregative intent based upon the attendance patterns of the plan.
 
 
 163
 Reviewing the trial transcript, this court perceives that the district court's focus was too narrow and that it "overlooked the broader inquiry mandated by Swann." Court's Opinion at 1503. Of course, the cases this court relies upon involve the affirmative duty to desegregate dual school systems. This court also relies upon Diaz v. San Jose Unified School Dist., 733 F.2d 660, 666 (9th Cir.1984), cert. denied, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985), involving a California state-law affirmative duty to desegregate regardless of the cause of segregation. No such state law is involved in this case, and the affirmative duty to desegregate has been accomplished, as evidenced by the repeated findings of unitary status. See Dowell, 795 F.2d at 1522 (1977 unitariness finding binding); Dowell, 677 F.Supp. at 1515-19 (system has retained unitariness from 1977 to present). Finally, this court quotes the district court decision in Keyes, 609 F.Supp. 1491, now on appeal, see supra note 8, which seems to say that the motivations and good faith of board members or school administrators is not relevant in deciding institutional intent. See Court's Opinion at 1503. According to this court, only circumstantial evidence is available. Id. at 1502 n. 49, 1503.
 
 
 164
 This is too categorical a view of the intent inquiry. Such an approach essentially makes a credibility determination in advance and, of course, credibility is properly left to the trier of fact, every time. Because the school district is directed by its board and acts through its agents (personnel), the district court certainly could consider testimony concerning whether the neighborhood school plan was enacted with segregative intent, just as it can consider good faith compliance with a desegregation plan in deciding unitariness. Had some school administrator testified that segregative intent motivated the plan, such testimony certainly would be relevant. In addition to the motivation for adoption of the plan, the district court also was required to and did consider the effect of the plan. Finally, in complying with this court's directive in Dowell, 795 F.2d at 1522-23, the court attempted to ascertain whether it was likely that a return to a dual system was imminent should the 1972 decree be dissolved.[15]
 
 
 165
 The law requires the plaintiffs to prove discriminatory purpose. As the Supreme Court has explained "[t]he school desegregation cases have ... adhered to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). "[D]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation.... [But] actions having foreseeable and anticipated disparate impact are relevant to prove the ultimate fact, forbidden purpose." Columbus, 443 U.S. at 464, 99 S.Ct. at 2949. A district court may consider a school board's enactment of a neighborhood school plan which may lead to racial imbalance, as one factor among many, in deciding " 'whether an inference of segregative intent should be drawn.' " Id. at 465, 99 S.Ct. at 2950 (quoting Penick v. Columbus Bd. of Educ., 429 F.Supp. 229, 255 (S.D.Ohio 1977), aff'd in part and remanded in part, 583 F.2d 787 (6th Cir.1978), aff'd, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979)). But "[t]he inference is permissible, not mandatory." Higgins v. Board of Educ., 508 F.2d 779, 793 (6th Cir.1974); see also Alexander v. Youngstown Bd. of Educ., 675 F.2d 787, 792-93 (6th Cir.1982); Spangler, 611 F.2d at 1245 ("A policy favoring neighborhood schools is not synonymous with an intent to violate the constitution") (Kennedy, J., concurring). Thus, a district court is not required to infer segregative intent when there is racial imbalance in some schools. Id.
 
 
 166
 The district court's task concerning intent has been summarized by the Sixth Circuit:
 
 
 167
 It is thus the duty of the District Court to determine whether, on the facts of a particular case, an inference of segregative intent should be drawn. The impact of the challenged official conduct is an important starting point. Other evidentiary sources available to the fact-finder include the historical background of that conduct, the specific events leading up to it, and the administrative record, particularly where there are contemporaneous statements by members of the decisionmaking body, minutes of its meetings, or reports.
 
 
 168
 Alexander, 675 F.2d at 792. The district court in this case specifically considered the history of the enactment of the neighborhood school plan and found an absence of segregative intent. Dowell, 677 F.Supp. at 1513. Reinforcing this finding is the district court's considered analysis of the documents and testimony concerning the enactment of the neighborhood plan.
 
 
 169
 Without question, this court's principal concern is "the emergence of thirty-two effectively one-race schools." Court's Opinion at 1502. However, the statistic is inflated and other factors must be considered. Spangler, 611 F.2d at 1245 (Kennedy, J., concurring). To be sure, adoption of an elementary assignment plan in a former de jure system which (1) uses existing neighborhood boundaries which plainly were not drawn for maximum integration, and (2) results in 11 virtually one-race black schools with consequent rise of the system-wide black versus non-black dissimilarity index, from .24 to .39,[16] and an even more pronounced rise in the elementary black versus non-black dissimilarity index, from .24 to .57,[17] Dowell, 677 F.Supp. at 1508-09, creates a permissible inference of segregative intent. So too does the assignment of greater numbers of black faculty/staff to schools with predominantly black enrollments. The district court clearly was aware of these factors and "sharply focused on the racial composition of the predominantly black schools which came into being as a result of the neighborhood plan," Dowell, 677 F.Supp. at 1517, as well as the faculty/staff imbalance. Id. at 1518-19. Although the facts in this case might logically support a judgment for either side, our task is not to decide the case anew. Alexander, 675 F.2d at 801.
 
 VI.
 
 170
 Relevant factors led the district court to conclude that there was an absence of segregative intent on the part of the school board and that the system remained unitary. A neighborhood school policy is not, in and of itself, violative of the fourteenth amendment. Crawford v. Board of Educ., 458 U.S. 527, 537 n. 15, 102 S.Ct. 3211, 3217-18 n. 15, 73 L.Ed.2d 948 (1982). Just as equal educational opportunity is a national policy, so too is neighborhood schooling. 20 U.S.C. Sec. 1701.
 
 A.
 
 171
 The impetus for the neighborhood plan at the elementary level was the board's determination that the 1972 Finger Plan, as modified over the years, was structurally inadequate to meet the educational and equitable objectives of the district in grades 1-5. As enacted and revised, the neighborhood plan had several objectives, including 1) maintaining a unitary system, 2) establishing K-4 schools in the northeast section where none existed, 3) maintaining K-4 neighborhood schools with stability, 4) increasing pride and parental involvement in the elementary schools, and 5) continuing an integrated school district in an urban setting. Pl. hearing ex. 1 (Def. ex. 96, see rec. vol. I, doc. 17, app. D. at 12, 29), Sec. 1 at 2 (1985-86 student assignment plan). The school board expected the following advantages: 1) neighborhood schools, 2) fifth-year centers in all areas, not just the northeast quadrant, 3) reduction of busing, 4) program improvement, including increased participation in extracurricular activities, 5) increased parental participation, and 6) increased community involvement and support. Id.; rec. vol. III at 347. Obviously, the neighborhood assignment plan meets certain of these objectives better than others. It is decidedly ineffective in promoting integration in some schools given the 11 90% + black schools.
 
 
 172
 In the simplest analysis, the school board appears to have elevated the educational value of student assignment based on proximity over the social value of mandatory integration in grades 1-4.[18] The school board viewed the advantages of neighborhood schooling as outweighing the negative effect that this program has on the racial balance in some elementary schools. From a personal perspective, we may regard this to be a regrettable choice;[19] however, once a de jure school system and its vestiges are eliminated, the Constitution empowers local authorities to make such choices in the absence of segregative purpose.[20] In the factually similar Riddick case, 784 F.2d at 521, the Fourth Circuit upheld a unitary school district's neighborhood plan where 40% of the minority students attended ten 90% + minority schools. Id. at 527 n. 7 (40% derived from data presented in footnote 7). Moreover, even in the remedial phase, which we are long past, a court may not order strict racial balancing or quotas. Swann, 402 U.S. at 23-24, 91 S.Ct. at 1279-1280.
 
 B.
 
 173
 As acknowledged by both sides and found by the trial court, there were inequities associated with the "stand-alone" feature. Dowell, 677 F.Supp. at 1514. These inequities were revisited when the school board voted 4-3 to make Bodine a stand-alone school. Analyzing the events which led up to the neighborhood plan for extreme and unexpected hardship to the school board, Court's Opinion at 1497, this court concludes that the "stand-alone feature ... emerged from the evidence as a matter of speculation tied to capacity problems, budget constraints, and local politics." Id. at 1498. This implies that the neighborhood plan was motivated by concerns that were not bona fide.
 
 
 174
 As of 1983-84, there were three K-4 stand-alone schools, Harrison, Edgemere and Western Village, with Rockwood joining the list as of 1984-85. Def. ex. 76, reproduced in Appellants' Addendum to Brief at 332, 345. At the same time there were two K-5 stand-alones: Arcadia, because of location and Horace Mann, because of racial balance. Id. at 347. The board then voted to make Bodine a K-5 stand-alone school. Id. at 351.
 
 
 175
 Initially, the stand-alone provision in the Finger Plan was to operate when the black student percentage in a neighborhood attendance zone exceeded 10%, but was less than 35%. Pl. ex. 6, reproduced in Appellants' Addendum to Brief at 20. In the 1972-73 school year, there were 11 stand-alone schools, not all of which met the above criteria.[21] Pl. ex. 13, reproduced in Appellants' Addendum to Brief at 98. The criteria changed over the years, but the concept was retained. The school's planning department determined initial eligibility for K-4 and K-5 stand-alone status based on whether the black student percentage of the neighborhood attendance area would result in a school which was plus or minus (±) 10% or ± 15% (depending upon school size) of the district average of black students for the particular grade configuration, i.e. K-4 or K-5. See def. ex. 72, reproduced in Appellants' Addendum to Brief at 275-76. Thus, as of April 1984, the planning department identified 11 schools which were eligible for K-4 stand-alone status. All but one of these schools were eligible, in the alternative, for K-5 stand-alone status in addition to 3 other schools, bringing the total number of schools eligible for K-5 stand-alone status to 13.[22] Id. at 276; accord rec. vol. IV at 427. The planning department then identified 9 schools to be considered as potential K-5 stand-alone sites. See def. ex. 72, reproduced in Appellants' Addendum to Brief at 275.
 
 
 176
 Dr. Welch also considered the geographic pattern of schools eligible for stand-alone status solely on the basis of whether the racial composition of an elementary attendance area was ± 15% of the system-wide black average of 35%. Rec. vol. III at 216-218. He noted that the location of these schools supported the contention that there had been diffusion of the black population from the northeast quadrant.
 
 
 177
 The district court correctly noted that three expert witnesses in the case acknowledged that the 1972 Finger Plan, including the stand-alone feature, was now inequitable because of demographic change. Dowell, 677 F.Supp. at 1514. Defendants' expert Dr. Welch testified that "it's just not a plan that was designed to withstand the kind of demographic change that occurred in this district." Rec. vol. III at 220. Quite apart from Dr. Welch's projections indicating that more schools would be eligible for stand-alone status by 1995,[23] he testified that there are inherent limitations to the plan: 1) it was designed for an elementary student population that was 20%, not 40% black, 2) as more schools qualify for stand-alone status, busing distances for those still bused will be longer, and 3) schools housing fifth-year centers will be forced to close if enrollment declines due to fifth grade students attending stand-alone schools. Id. at 219-20, 225-226. Add to that, the plan does not consider the presence of other minority groups. Rec. vol. III at 312-22 (Dr. Biscoe). Dr. Welch's forecasts for 1995 indicated that more schools would qualify for stand-alone status. Id. at 224; see supra note 23.
 
 
 178
 School board member Dr. Clyde Muse was troubled by the implications of an increasing number of schools eligible for stand-alone status. Rec. vol. IV at 424-28. He believed that because of the central location of many of the potential stand-alone schools, busing distances for some students would increase and the closing of some fifth-year centers in the northeastern part of the district became a real possibility. Id. at 425-26. Plaintiffs' expert Dr. Foster agreed with Dr. Muse concerning the disproportionate impact of stand-alone schools. Rec. vol. VIII at 1266-67. Dr. Muse described the fifth year centers as "the only elementary schools in the black community." Id. He recognized that the "stand-alone" feature of the plan had to be eliminated because the board would always be pressured to create stand-alone neighborhood schools in qualifying neighborhoods, perhaps at the expense of the non-stand-alone components of the elementary system. Id. Board member Hill put it this way: "Our patrons, our communities, had been told since '72 that, if they became integrated, they could have a neighborhood school, and they could not understand why they had followed exactly what the court said and the board was not giving them their K-5 schools." Rec. vol. IV at 528. The comments of Dr. Muse and Mrs. Hill also are corroborated by the minutes of the school board meeting concerning K-5 stand-alone status for Bodine. See Def. ex. 76, reproduced in Appellants' Addendum to Brief at 348-51 (summary of hearings between interested persons and board members concerning stand-alone status for Bodine).
 
 
 179
 Another inequitable feature of the 1972 Finger Plan as implemented over the years was that black students were bused during the first four years to schools outside black residential areas, while white students were not bused until the fifth year. See rec. vol. VIII at 1265 (Dr. Foster). Of course, a desegregation plan may "not unfairly burden minority students." Keyes v. School Dist. No. 1, 521 F.2d 465, 479 (10th Cir.1975), cert. denied, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976); Higgins, 508 F.2d at 793. Both sides are in agreement that this feature of the 1972 plan required modification.
 
 C.
 
 180
 As designed and implemented, the neighborhood plan continued the majority-to-minority transfer option under existing Policy JCA-M. Pl. hearing ex. 1, Sec. 1 at 4. Free transportation was provided for elementary students exercising the option. Dowell, 677 F.Supp. at 1523. The district court viewed this option as one attribute of a unitary system. The district court said: "In a word, parents in Oklahoma City today have a choice. No pupil of a racial minority is excluded from any school in Oklahoma City on account of race." Id. In a statement too sweeping, this court then says that "[t]he record does not support this assertion." Court's Opinion at 1500. Does the court mean that parents do not have a choice or that minority students are being excluded from schools in the district, or both? The discussion that follows concerns the majority-to-minority transfer option and perhaps the court is questioning only the transfer option. If this court is saying that the efficacy of the transfer option is not supported by the record, that is one thing. But is quite another to claim that the evidence does not support an absence of the purposeful racial discrimination inherent in excluding a student from a public school on the basis of race. The record most certainly and repeatedly supports the contention that students are not excluded from the public schools on the basis of race; there has been compliance with Brown I and the district is not operating a dual system of assignment at any level.
 
 
 181
 The majority-to-minority transfer option has been described "as a useful part of every desegregation plan." Swann, 402 U.S. at 26, 91 S.Ct. at 1281. In a school district charged with an affirmative duty to desegregate, the purpose of the option is remedial. Id. Here, the district court recognized that retention of the option was indicative of the board's legitimate, not discriminatory, motivation in enacting the neighborhood plan. The operation of the option is not indicative of segregative intent.
 
 
 182
 This court views the district as under an affirmative duty to desegregate and is concerned that parents do not understand the option and will not "freely" exercise it. Court's Opinion at 1501. The option is not new, parents were provided with a letter explaining the option, rec. vol. III at 310, 327, and I submit that the court's real concern is that a voluntary option cannot result in racially balanced schools. Obviously, if only 332 students transferred under the option in 1985-86, and 181 transferred in 1986-87, Dowell, 677 F.Supp. at 1523, the option will not achieve racial balance. The court's real complaint is the paternalistic notion that black parents will not choose the option.[24] Contra P. Gerwitz, Choice in the Transition: School Desegregation and the Corrective Ideal 86 Colum.L.Rev. 728, 756-77 (1986) (cited in Court's Opinion at 1492 n. 18; arguing that choice to attend predominantly minority school is tainted).
 
 D.
 
 183
 The district court also considered the laudable goal of increased parental and community involvement brought about by the neighborhood plan. Dowell, 677 F.Supp. at 1516-17. Apparently, the court views this evidence as an attempt to compensate for the lack of a unitary school system. See Court's Opinion at 1502. Such is not the case. Instead, the evidence reinforces the lack of discriminatory intent in the enactment and implementation of the neighborhood plan. It also corroborates the testimony from school officials that increased parental involvement was a partial motivation for the plan. The court acknowledges that there was a "substantial increase in parent participation," Court's Opinion at 1502 n. 47, yet questions the "conflicting evidence" the district court relied upon in finding a causal link between instituting the neighborhood plan and increased parental participation. Id.
 
 
 184
 Despite this court's objection on hearsay grounds to Dr. Mason's testimony concerning parental involvement, id., witness after witness testified based upon personal knowledge that the increased participation of parents was due to the neighborhood plan.[25] ,[26] Conversely, several witnesses indicated that busing had an adverse effect on parental involvement.[27]
 
 
 185
 Defendants' expert Dr. Lane testified that an effective schools program,[28] is enhanced by a neighborhood schools program because "a neighborhood school program can insure greater parental involvement, and one of the hallmarks of an effective school is parental involvement.... Proximity means easy access, and that's very good, and the neighborhood school does help that." Rec. vol. VI at 897. Dr. Walberg indicated that the neighborhood reassignment plan, with its emphasis upon interaction between students, teachers and parents, contributed to the educational mission of the district. See rec. vol. VI at 918-22, 934. He termed it "the next logical step to improve the education of the children in the Oklahoma City Public Schools." Id. at 953. Dr. Steller testified that parental involvement enhances academic achievement. Rec. vol. V at 736; accord id. at 796 (testimony of Ms. Scobey); see also Riddick, 784 F.2d at 541.
 
 E.
 
 186
 This court's approach to the school board's evidence is to judge it against an improper legal standard given the unitary status of the school district. This court then compounds the problem by searching the record for conflicting evidence and holding the school board to an impossible standard of proof which does not allow the school board to prevail if there is any conflicting evidence. This practice is directly contrary to the standard by which we carry out our appellate function. Anderson, 470 U.S. at 573-576, 105 S.Ct. at 1511-1512 ("This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court."). Moreover, this court's appellate factfinding is not free from error.
 
 
 187
 Consider the conflicting trial evidence on academic achievement. This court addresses such information, Court's Opinion at 1501, and in the context of the district's continued unitary status, comments that "there is no evidence of specific educational programs designed for those racially identifiable elementary schools to counteract the effect of low achievement in these schools." Id. In its revised opinion, this court then criticizes the dissent for "wad[ing] into this area." Court's Opinion at 1503-04 n. 51.
 
 
 188
 The district court rejected the notion that schools must be racially balanced for maximum academic achievement. Dowell, 677 F.Supp. at 1523-24. In so deciding, the district court relied upon several evidentiary sources, including the school board's information indicating that the gap between black and white third graders was reduced 13% between 1985-86 and 1986-87, after introduction of the neighborhood schools program. Id. at 1524. While the comparison may be difficult to generalize, it is not because the test comparisons are "flawed" because "[t]he group of students studied one year is not the same studied the next year." Court's Opinion at 1501. Dr. Steller indicated that an acceptable comparison could be made even if the students were not the same; that comparison of the same grade level is an accepted technique. Rec.vol. V at 744. Indeed, different groups of third-graders over time are implicit in the comparison. Moreover, even plaintiffs' expert Dr. Crain testified that an alternative to comparing the same group of cohorts over time is to compare different cohorts at particular grade levels. Rec.vol. VII at 1003. The district court could consider this comparison without committing clear error.
 
 
 189
 The district court also could rely upon the information that 8 of 10 neighborhood elementary schools with 90% + black enrollments had achievement test gains which surpassed the national average for black students. Dowell, 677 F.Supp. at 1524. This court's observation that "gain is an elusive concept," Court's Opinion at 1501 n. 44, goes to the weight of this evidence; it does not render the district court's finding that the neighborhood plan is one factor which may enhance academic achievement at some schools clearly erroneous. See rec. vol. VI at 933-34, 946-47 (Dr. Walberg testified that neighborhood school plan, effective schools program and increased parental involvement are major causes of improvement and only slight drops at other 2 schools).
 
 
 190
 Though gain may be an elusive concept, the court does tell us that scores at 2 schools dropped. Id. at 1501. Does this mean that gain does not inure to the benefit of the defendants because it is elusive, but loss does? The court is merely reweighing conflicting evidence to produce different outcome. However, the court's efforts notwithstanding, the district court's ultimate finding that academic achievement will not be harmed if schools are not racially balanced is not clearly erroneous.
 
 
 191
 In the same vein, the court dismisses the effective schools program by telling us that it "is geared to the upper grades." Court's Opinion at 1501. Not so. As support, this court cites Dr. Crain's testimony. Id. (citing Rec.vol. VII at 1004-05). Dr. Crain admitted that there was "not very strong evidence that Oklahoma City is following the national trend in which segregation is harmful to achievement." Rec.vol. VII at 1004. He attributed this to the recency of the neighborhood plan and then said that "[t]he best I can say is that certainly the new effective schools program that I've read some literature about is working in the upper grades better than it is the lower grades." Id. at 1004-05. Dr. Crain's reading about an effective schools program somewhere hardly supports the proposition that this program in this district is geared to the upper grades. To the contrary, the effective schools program appears to have been successfully implemented in the elementary grades at issue. Rec.vol. V at 685-88 (Dr. Hughes); 702-03 (Dr. Steller); vol. VI at 880-81 (Dr. Lane).
 
 
 192
 Likewise, this court tells us that the effective schools program is "tied to budgetary constraints experienced by the District." Court's Opinion at 1501. For this proposition, the court cites Dr. Lane's testimony where he was asked how Oklahoma City compares to other districts "in implementing an effective schools program and in carrying out their instructional philosophy." Rec.vol. VI at 881. Dr. Lane replied that the district compared favorably. Id. He said: "I have found that this district, laboring under tremendous fiscal constraints, has made giant strides." Id. Such a statement hardly links the effective schools program to the district's fiscal constraints. Likewise, the court is concerned with the absence of specific programs designed for the racially identifiable elementary schools. Court's Opinion at 1501. However, Dr. Hughes testified that one of the major purposes of the effective schools program is to narrow the differences in achievement based upon socioeconomic and racial differences. See rec. vol. V at 688. Indeed, under the proposed Foster Plan B, 24% fewer low income students (710) will be eligible for federally funded remedial math and reading help given the program requirements. Rec. vol. IX at 1496 (Dr. Steller).
 
 
 193
 The district court's finding concerning increased parental involvement caused by the neighborhood plan, Dowell, 677 F.Supp. at 1516-17, and the efforts of the district to provide improved educational opportunity for all, id. at 1522-24, are not clearly erroneous. These findings, along with others, support the ultimate factual finding of continued unitary status.
 
 VII.
 
 194
 Regarding faculty/staff assignment, this court says that the district court "did not address plaintiffs' exhibits 48, 50, 52 and 54[,]" which show, to use the court's oxymoron, "the growing parity of imbalance" between faculty and students. Court's Opinion at 1500. This court relied on plaintiffs' exhibit 54, prepared by plaintiffs' counsel, rec. vol. VIII at 1270, and introduced through Dr. Foster, which tends to show that schools with higher black enrollments have more black teachers.[29] Without question, the district court was aware of this phenomenon, see Dowell, 677 F.Supp. at 1518, but it declined to infer segregative intent. After the district enacted the neighborhood plan, it became necessary to reassign 500 teachers. Rec. vol. IV at 548. In a negotiated agreement with the teachers' union, whereby teachers were allowed to indicate preferences as to assignment, with senior faculty receiving first preference. Id. at 1518. The executive director of personnel testified that retention of qualified faculty was a motivating concern for the choice provision. Rec.vol. IV at 546, 548. He acknowledged that this caused some racial imbalance and there was a desire to make sure that this assignment process was not repeated. Id. at 555.
 
 
 195
 The response of the school district to this situation is relevant to understanding the district court's finding of no segregative intent. This court states: "Although the executive director of personnel testified that especially after 1985, the teacher assignments would comply with the district affirmative action goal of 36.9% with a 10% variance factor [± 10%], the numbers belie the aspiration." Court's Opinion at 1500 (footnote omitted). The personnel director, Vern Moore, actually testified that there would be compliance in almost all of the elementary schools by August 1987. Rec. vol. IV at 557; see also def. ex. 199 (tracking status of compliance at schools as of June 1987). His testimony did not indicate that earlier balance was expected. The court's statement makes it appear that since 1985 the district has ignored the situation. Not so. Moreover, this court is of the view that specific evidence of a change is lacking. Court's Opinion at 1500.
 
 
 196
 Mr. Moore testified that as of April 1987, building administrators were given direct responsibility for compliance with affirmative action goals and faculty racial balance. Rec. vol. IV at 553. Because several schools were closing, it was necessary to assign a veritable gondola of teachers; the board entered into an agreement with the teachers' union that provided that teacher preference would be honored so long as the district's personnel goals were met. Id. at 555. This was expected to be a big help in complying with the board's standard. Id. at 559.
 
 
 197
 Mr. Moore also prepared projections for the 1987-88 school year, indicating that many K-4 elementary schools would have the system-wide black faculty average of 36.9%, plus or minus (±) 10%. Id. at 556-59. He also indicated that the racial composition of the administrators at the elementary schools with 90% + black enrollment was 4 blacks out of 10 administrators in 1986-87, and 3 blacks out of 10 administrators in 1987-88. Id. at 552. As for those elementary schools with less than 10% black enrollment, the racial composition of the administrators was 1 black out of 13 administrators in 1986-87, and 4 blacks out of 12 administrators in 1987-88. Id. Linda Joyce Johnson, affirmative action program planner for the district, corroborated Mr. Moore's statements. Rec. vol. V at 809-10. Ms. Johnson testified that the board had adopted a recommendation which would bring the faculties into greater racial balance. Id. The district court credited her statements. See Dowell, 677 F.Supp. at 1519.
 
 
 198
 Plaintiffs' expert Dr. Foster testified that the neighborhood school plan resulted in a higher concentration of black faculty at schools with the highest percentages of black enrollments and a lower concentration at schools with the lowest percentage of black enrollment. Rec. vol. VIII at 1269-70. Dr. Foster's concern was that a school should not be considered racially identifiable based upon faculty assignment. Id. at 1270. On direct examination, Dr. Foster was asked to comment upon the faculty assignment exhibits relied upon by the plaintiffs and this court:
 
 
 199
 Mr. Chachkin: Now, Dr. Foster, ... in describing the last four of those exhibits that dealt with faculty, you talked about patterns of assignment.
 
 
 200
 You've been here through the defendants' testimony concerning the new board policy in administrative procedure concerning faculty assignments and affirmative action goals at individual schools; is that correct?
 
 
 201
 Dr. Foster: Yes.
 
 
 202
 Mr. Chachkin: What's you opinion concerning the new policy and procedure in light of--how is that going to affect the patterns that you've noted in your own analysis?
 
 
 203
 Dr. Foster: In my opinion, if these are followed in a fairly short time, they should be productive to the extent that all schools would ... be in line.
 
 
 204
 Id. at 1275-76.
 
 
 205
 Dr. Foster thought that it might be difficult for the district to comply with its voluntary affirmative action goal of placing ± 10% of the system-wide average (36.9%) of black faculty at every elementary school, but he had no problem with such a standard. Rec. vol. IX at 1387-88. The standard might be difficult to meet because the elementary system-wide average for black faculty is only about 30%. Rec. vol. VIII at 1276. He then stated:
 
 
 206
 Dr. Foster: Other than that, I think if the personnel services as the board adopted the policy signs off on all transfers and employment and they won't approve them unless they're in line with the goals that are outlined in the policy, it should work out.
 
 
 207
 It's not that far off as it is right at the moment, but there are trends and discrepancies that have been obvious the last couple of years.
 
 
 208
 Id. at 1276-77. Dr. Foster also agreed that the imbalance of the faculty was not due to an intent to discriminate by the board, rather "[t]hey simply slid a little bit during that period, and, as I see it, the board is now getting them back into shape." Rec. vol. IX at 1389. Thus, the district court could rely upon the nondiscriminatory one-time reason for the faculty imbalance, together with the efforts of the district to attain racial balance in the elementary faculties, and conclude that the racial imbalance in the faculty which had existed was not indicative of segregative intent.
 
 VIII.
 
 209
 This court's direction to the district court to take evidence concerning "alternatives to maintain racially balanced elementary schools," modify the Finger Plan, and then "retain jurisdiction for a reasonable period of time to oversee the implementation and maintenance of [the] assignments," Court's Opinion at 1506, is nothing short of a call for another remedy of unlimited duration. The district court plainly recognized that residential separation results in neighborhood schools which are virtually one-race black schools. Dowell, 677 F.Supp. at 1521. Plaintiffs' expert Mr. Rabin[30] testified concerning the residential separation which still exists in Oklahoma City. But this residential separation was never linked to the school board:
 
 
 210
 Mr. Day: My question, Mr. Rabin, was with regard to the actions of the Oklahoma City Board of Education. Are you aware of any action the board took, after this court entered its decree in 1963, which compelled black to live in those tracts or any of the other 16 which you've identified as predominantly black?
 
 
 211
 Mr. Rabin: I'm not. No. No.
 
 
 212
 Rec. vol. VII at 1154-55. It is inimical to due process to hold this school board responsible, under power of contempt, Dowell, 795 F.2d at 1523, for a current condition which it did not create and is not empowered to change--residential separation. See Dowell, 677 F.Supp. at 1521.
 
 
 213
 The reality is that the 1972 plan no longer met the educational objectives of this district in grades 1-4. Resurrecting the 1972 Finger Plan concerning assignment, which was substantially changed over the years due to demographic change and finally replaced in 1985, probably is a step backward. A generation of students has been schooled, facilities have changed, the population has moved and the racial composition of the system has been altered significantly. The district has not been afraid of innovation to improve the educational experience; the Adopt-A-School program, Dowell, 677 F.Supp. at 1517, the Student Interaction Plan, Court's Opinion at 1501,[31] and the Equity Officer and Committee,[32] are evidence of that. These programs do not result in racial balance at every school, see Court's Opinion at 1502, but they do contribute to the district's mission of providing high-quality educational opportunity in a unitary system.
 
 
 214
 This court does not really deal with the plaintiffs' integration plan which the district court found unworkable as proposed. Dowell, 677 F.Supp. at 1524-26. Stating that its "focus is upon the issue of desegregation," this court ignores the practicality of implementing its mandate, declaring such concern to be "shibolethic [sic] speculation." Court's Opinion at 1493 n. 19. Of course, we know that the 1972 Finger Plan required extensive transportation, as would the proposed Foster Plan. Under Dr. Foster's plan, which restructures some elementary schools into K1-2 and K3-4 schools and leaves others as K1-4, the busing burden would be borne equitably between white and black students. The district court found that the school district would experience "a substantial wave of white flight." Dowell, 677 F.Supp. at 1525. Indeed, one of the permissible motivations of the neighborhood plan was to avoid white flight and increase student retention. See rec. vol. IV at 537-38 (discussing lower non-black retention rates).[33] This court does not reject that finding, although it does cast doubt upon it, based upon a footnote in a law review article that referenced an American Lawyer report. See Court's Opinion at 1505 n.56. Looking at the data in this case, however, Dr. Steller indicated that if the Foster Plan were adopted some students would have switched schools three times as of the fifth grade. Rec. vol. IX at 1485. Dr. Lane testified that dismantling the neighborhood plan would be disruptive because it destroys the anchor of the neighborhood school and redirects scarce resources: "Let me put it this way. This district has opted for learning; this district has opted, it seems to me, for education; and that's where it wants to put its resources." Rec. vol. VI at 898. With finite resources and energy, the school board necessarily will have to rearrange objectives given this court's decision. Rec. vol. VI at 944 (Dr. Walberg).
 
 
 215
 Linking the defendants' constitutional responsibilities to the logistics of a 17 year-old desegregation plan requires a very static view of the world. It also confuses the original remedy with the violation. As the Fifth Circuit has said:
 
 
 216
 [C]ontinuing limits imposed as a remedy after the wrong is righted effectively changes the constitutional measure of the wrong itself; it transposes the dictates of the remedy for the dictates of the constitution and, of course, they are not interchangeable. Stated another way, the constitutional violation is purposeful separation of races in public education. The mix that would have occurred but for the racism is a judicially created hypothetical. We have insisted upon matching that model of a unitary desegregated status as a remedy for the wrong. Refusing, after the match, to allow a school district to vary from that model unless it proves in "nonsegregative" purpose confuses wrong and remedy.
 
 
 217
 Overton, 834 F.2d at 1176-77. Here, the school district proved non-segregative purpose to the district court and still does not prevail. Absent a constitutional violation, the school district should not be monitored by a federal court in perpetuity. The original desegregation decree in this case should be lifted and the schools entrusted to local control as our federal Constitution envisions.
 
 
 
 [1]
 The Finger Plan was adopted only after the Board failed to produce an acceptable desegregation plan to the district court
 
 
 [2]
 These numbers are taken from Def. Ex. 63. Schools with less than 10.7% black population were included in the total
 
 
 [3]
 In Oklahoma City, Indian, Spanish, and Oriental children comprise the non-black minority population counted
 
 
 [4]
 Fed.R.Civ.P. 60(b) states:
 On motion and upon such terms as just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding....
 
 
 [5]
 The dissent takes several opportunities to disagree with this unreversed holding. Nonetheless, it is the directive with which this court remanded the case, and the trial court was not free to depart from our mandate. Moreover, the holding is the present law of this circuit
 
 
 [6]
 Although the stipulation was not found in the pretrial order, we presume the parties agreed the injunction had been violated because defendants presented their evidence of substantial change first
 
 
 [7]
 To reach this conclusion, the district court accepted defendants' prediction that as new areas of the district qualified for "stand-alone" status, the distances which black students in grades 1-4 would have to be transported to attend integrated schools would increase. Fifth-grade centers in the northeast quadrant would then close because of the consequent diminished enrollment
 
 
 [8]
 The dissent takes the position that because this case involves the desegregation of a public school system, the usual standards applicable to federal law on injunctive remedies are inapposite. The Supreme Court has said, "However, a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)
 
 
 [9]
 The Court stated in United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932), "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need."
 
 
 [10]
 Although Swift involved a consent decree, the Court asserted the same standards apply after litigation. Moreover, the Court applies no distinction to requested modifications of decrees sought by either plaintiffs or defendants. United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)
 
 
 [11]
 "Swift teaches that a decree may be changed upon an appropriate showing, and it holds that it may not be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree ... have not been fully achieved." United States v. United Shoe Mach. Corp., 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968) (government sought modification of injunction to achieve purposes of original decree). See 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2961, at 602-03 (1973)
 
 
 [12]
 It is noteworthy that the original Swift decree, affirmed in 1905, Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905), was followed by a second decree in 1920 which was not dissolved until 1981
 
 
 [13]
 In Jan-Dal Oil & Gas, 433 F.2d at 306, we reversed the district court's dissolution of a permanent injunction upon finding defendant's proof established merely "short term compliance with the law." Id
 
 
 [14]
 Our case differs from Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 437-38, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976), which found modification appropriate because "no majority of any minority" provision in the 1974 injunction was "contrary to the intervening decision of this Court in Swann."
 
 
 [15]
 While the Supreme Court has defined neither the meaning of the term unitary nor the time and method of closing a school desegregation case, the Court has suggested that the elimination of "invidious racial distinctions" related to student assignment, transportation, support personnel, and extracurricular activities, and the school administration's concern for producing and maintaining schools of like quality, facilities, and staffs meet a threshold showing of unitariness. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971); see also Ross v. Houston Indep. School Dist., 699 F.2d 218, 227-28 (5th Cir.1983) ("Constructing a unitary school system does not require a racial balance in all of the schools. What is required is that every reasonable effort be made to eradicate segregation and its insidious residue." (citations omitted)). Professor Fiss has queried, "But what is a permissible basis for assigning students to schools under a 'unitary nonracial school system'? This seems to be the central riddle of the law of school desegregation." Fiss, The Charlotte-Mecklenburg Case--Its Significance for Northern School Desegregation, 38 U.Chi.L.Rev. 697, 700-01 (1971)
 
 
 [16]
 The Morgan court defined unitary status as "a fully integrated, non-segregated system," 831 F.2d at 316, that is, complete desegregation "in all aspects of the ... schools." Id. at 318
 
 
 [17]
 The dissenting opinion, like that in Overton, 834 F.2d at 1171, confuses a trial court's jurisdiction to enforce its mandatory orders with the concept of finality. We agree that a federal district court should not attempt an interminable supervision over the affairs of a school district. Recognizing the inherent power to enforce prior orders, however, is not inconsistent with the objective of curtailing active supervision. Once the school district has achieved unitariness, the court's need for active jurisdiction ceases. Its power to enforce its equitable remedy, however, is born when the remedy is fashioned and does not die until the remedy expires. By upholding this power, we are not holding, as the dissent seems to suggest, that a district court retain post- remedy authority over a school district for any reason other than to enforce, modify, or vacate its decree. Thus, the dissent's suggestion that we have added a new dimension to the law by "retaining jurisdiction" over this case fails to recognize we add nothing to the district court's jurisdiction that it did not already possess
 
 
 [18]
 Professor Landsberg correctly points out that this "core issue of the substantive obligations of formerly de jure school systems which have successfully desegregated" has been overlooked in the judicial haste to restore school governance to local authority. 48 La.L.Rev. 789, 815 (1988). See also P. Gewirtz, Choice in the Transition: School Desegregation and the Corrective Ideal, 86 Colum.L.Rev. 728 (1986)
 
 
 [19]
 The dissent states: "Here, despite the school district's continued unitary status, this court retains jurisdiction and now orders the school district to racially balance the elementary schools which most certainly will require busing." Dissent at p. 1506. We are compelled to point out that the question of continued unitariness of the District so readily assumed by the dissent was the key factual controversy in this case. Moreover, both sides recognized conditions had changed since the entry of the injunctive order, thus clearly suggesting the incongruity between those changed circumstances and the facts which convinced the trial court the District was unitary. Whether the District was unitary before circumstances changed is irrelevant to whether the decree should be amended or vacated. Indeed, whether the District remains unitary in light of changed circumstances is a wholly different question. Finally, our focus is upon the issue of desegregation. How that objective will be reached must be left first to the Board's judgment, and we will not engage in shibolethic speculation
 
 
 [20]
 Dr. Clark produced relocation statistics for black families with kindergarten children, 1974/75 to 1977/78, and black families with children in three grade levels, 1982/83 to 1984/85. The results are visualized in Def. Exs. 7 and 8
 
 
 [21]
 The court's order reproduced only the figures for black population. Defendant Exhibit 5D, on which the court relied, also represented "total population" figures for the studied tracts
 
 
 [22]
 The district court noted that "turnover" refers to persons who did not live in the same house five years previously
 
 
 [23]
 In Keyes v. School Dist. No. 1, Denver, Colo., 609 F.Supp. 1491, 1508 (D.Colo.1985), the district court rejected evidence of demographic change based on the long census form because of its omission of key information and incomplete sampling
 
 
 [24]
 "In 1960, 84% of all blacks residing in the Oklahoma City metropolitan area lived within these tracts. In 1980, however, only 16.8% of the total black population in the metropolitan area lived in this area." 677 F.Supp. at 1507
 
 
 [25]
 Dr. Clark stated that his use of the term "preference" does not preclude the element of prejudice. (R. II, 113)
 
 
 [26]
 Dr. Welch utilizes the terms "dissimilarity index" and "exposure index" to express these ratios. The former represents the distribution of the races in an area, while the latter indicates how well a school system is integrated based on the same two-group comparison, whites and non-whites. He then postulates that a dissimilarity index of .00 signifies a maximally integrated population while an index of 1.0 represents a segregated population. The exposure index reverses the ratio with .00 representing the most segregated population and 1.0 the most integrated neighborhoods. Dr. Welch's study relied principally on the dissimilarity index. "We do not use the exposure index very intensively in the study." (R. II, 130)
 
 
 [27]
 Dr. Welch stated on direct examination that the study of the dissimilarity index used in this comparison included 1968 to 1982 and did not show the dissimilarity in the District after implementation of the K-4 Plan in 1985. (R. II, 132). The inevitable conclusion, then, is that the achievement of integration in the District was the consequence of the adoption of the Finger Plan
 
 
 [28]
 Plaintiffs' objection to the admission of this comparison without any foundation was overruled on the ground it could show "some school boards are less attentive to the problem or more attentive to the problem than others." (R. III, 195-96). Nevertheless, the court utilized this comparison as substantive evidence of the impact of the Plan on the degree of "overall dissimilarity among the races." 677 F.Supp. at 1508
 
 
 [29]
 The court's analysis is based on Def. Ex. 39, a list of 117 school districts declared unitary according to a Justice Department press release. In response to Dr. Welch's statement that he had not verified the list (R. III, 280), the court agreed to take judicial notice of Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1413-14 (11th Cir.1985), which called the accuracy of part of the list into question
 
 
 [30]
 In 1986, whites comprised 47%, blacks 40%, and non-black minorities 13% of the District's enrollment
 
 
 [31]
 For example, on the basis of his calculations, Dr. Welch projected the black population in the District for 1995. (Def. Ex. 11). The projection represented areas between 92.3% and 100% black, becoming somewhere between 89.6% to 93.2% black. Dr. Welch stated the projections suggest whites will move into the area. (R. III, 252-53)
 
 
 [32]
 For example, counsel for the Board asked plaintiffs' expert, Dr. Foster, if busing young children would be potentially more difficult because "they're not fully developed." (R. VIII, 1367). The court asked one witness if, in her opinion, K-4 children are too young to be bused. (R. III, 338). Mrs. Clara Luper, a teacher at John Marshall High School, stated that her daughter was "excited about riding the bus." (R. IX, 1403). Testimony on busing distances tended to be based on estimates of time and mileage, not actual routing distance. See, e.g., R. V, 705
 
 
 [33]
 This total number includes the Star-Spencer area which was already treated differently under the Finger Plan because of its geographic separation from the District
 
 
 [34]
 These calculations are based on plaintiffs' Exhibit No. 26, Membership by School, Race and Grade, K-4 Elementary Schools. The District's data processing department generated the enrollment figures
 
 
 [35]
 Prior to Bodine's designation as a K-5 stand-alone, only two other K-5 stand-alones operated in the District. Horace Mann Elementary School became a K-5 facility when the Finger Plan was implemented. Arcadia was considered a K-5 stand-alone "based on different criteria" and was treated differently because of its isolated location. (Def. Ex. 76)
 
 
 [36]
 Before making Bodine stand-alone, the Board had agreed to add four classrooms because of capacity problems at the school. Until the addition was finished, however, 14 portable structures were necessary to solve the overcrowding. Even with the new addition, the Board estimated that 5 portables would still be needed. (Def. Ex. 76)
 
 
 [37]
 Overcrowding (Edgemere) and loss of racial balance caused eight schools to lose their stand-alone status. However, three K-4 stand-alones, Harrison, Edgemere, and Western Village, remained stand-alone. (Def. Ex. 76)
 
 
 [38]
 Student assignments were constrained by Policy JC which prohibited reassignment of students who had been reassigned within the prior three years. (Def. Ex. 70)
 
 
 [39]
 Swann envisioned stability "once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system." 402 U.S. at 32, 91 S.Ct. at 1284
 
 
 [40]
 In Ross, despite its finding of unitariness after 12 years of court-supervised desegregation, the Fifth Circuit affirmed the district court's decision to retain jurisdiction for an additional 3 years
 
 
 [41]
 In its amicus brief, the government contends the successful dismantling of a dual system represents the "changed circumstance" making the continuation of a court's jurisdiction unjustifiable. We are unwilling to revise Rule 60(b) to accommodate this position. We also reject the government's contention that sustained compliance with a desegregation plan is entitled to great weight and should create at least a presumption of unitary status. To do so simply eliminates any consideration of the future value of an injunctive order and fixes for all time equitable relief mandated by constitutional considerations on the basis of present conditions. The extension of the government's theory portends minority citizens have no assurance of any but short-term and pyrrhic victories
 
 
 [42]
 For example, in 1986-87, at Edwards Elementary School, which is 99.5% black, the faculty is 70% black. At Rancho Village Elementary School, which has a 10.6% black student population, there are no black teachers. (Pl.Ex. 54). In 1972, the Edwards' faculty was 15% black; Rancho Village's faculty was 23% black. (Pl.Ex. 48)
 
 
 [43]
 According to the witness, after the Plan was implemented, teachers with seniority were permitted to choose their teaching assignments. As a result of individual preference, many of the faculties became imbalanced. (R. IV, 555). In fact, prior to the Plan's implementation, Board member, Ms. Jean Brody, voiced her concern that the current teacher agreement was negotiated "without the knowledge that schools might be changed around." Def. Ex. 2
 
 
 [44]
 Dr. Finger observed that gain is an elusive concept, noting that "how much you can gain depends upon--on where you start.... It's easier to gain at the lower level--lower part of the scale than it is the higher part because the items are easier." (R. VIII, 1191). Dr. Carolyn Hughes, the assistant superintendent for curriculum and program development, stated that the District had undertaken to study the achievement gap using a method she called "the disaggregation of test data" which would look at "the disproportionality in achievement by race and socioeconomic level and gender." (R. V, 691)
 
 
 [45]
 Pressed on cross-examination to explain why he didn't believe social interaction outside of school was beneficial, Dr. Crain was asked if he thought taking black children to a shopping mall to see white children or going to a movie theatre, "rubbing elbows at the candy counter, wasn't beneficial." Defense counsel then suggested that such contacts might be beneficial to blacks to "allow them to become socially acceptable when they ... get out of school." (R. VII, 1093)
 
 
 [46]
 The Equity Officer, who reported to the superintendent, was "responsible for monitoring the implementation of the District's student assignment plan" and making "recommendations that will maintain equity of educational opportunity to all students in all schools." Def. Ex. 3
 
 
 [47]
 While the evidence established a substantial increase in parent participation in PTA-PTO, there was conflicting evidence on whether the District itself increased its commitment to generating parent involvement in the schools when neighborhood schools were reinstituted; how and what records were maintained to document parent participation prior to 1985; and what factors contributed to lack of parent participation--negative attitudes toward the schools, economics, etc. We are troubled by the nature of some of the evidence on which the court relied. For example, when asked about the decline in parental involvement in the schools prior to the 1970's and early 1980's, Dr. Betty Mason, the assistant superintendent of high schools, responded, "Again I have to give you the benefit of the discussions I have had with persons in the district as well as some of the readings that I have done...." (R. V, 610). When plaintiffs' objected to the testimony about to be elicited, the court overruled the objection on the ground that the statements were not hearsay but "important evidence for both sides." (R. V, 610-11)
 
 
 [48]
 The court was generous in its praise, viewing it as "significant that the Board has elected to employ intelligent and competent black individuals in upper-echelon central office administrative positions." 677 F.Supp. at 1519. School facilities "are not discriminatory ... [s]ince most of the predominately black schools today served as 5th-year centers under the Finger Plan ... and expenditures made by the Board for the students in the predominately black elementary schools is [sic] greater than that made in the elementary schools with a black population of less than 10%." Id. at 1519
 
 
 [49]
 Plaintiffs' counsel objected to the court's questions. (See, e.g., R. IV, 530; R. V, 619, 681, 695; R. VI, 860.) After one exchange between the court and Mrs. Betty Jo Hill, president of the Board, plaintiffs' counsel interjected his concern over the court's asking the witness if the schools were being operated as a unitary system and if the Plan altered the unitariness
 The Court: Well, this is a question that the court's got to answer.
 Counsel: I certainly agree with you, and I think that it a question for the court to answer. It's a question of law. It's one of the questions that the Tenth Circuit has indicated that the court must respond to. And I don't think--
 The Court: How could I respond to it unless I know what the evidence shows?
 Counsel: Well, with all due respect, I don't believe that it's an appropriate legal question to ask the opinion of a lay witness, and particularly a school board member, about.
 The Court: Well, she's had eleven years of the school board activities, and that should almost--in my opinion does make her somewhat of an expert.
 (R. IV, 530).
 The question, and those of the same nature repeatedly asked by the trial court, invited incompetent evidence. None of the witnesses was qualified to express either his opinion regarding the intent of the Board or whether the District was unitary. The question of intent is one for the trier of fact to decide from circumstantial evidence. The issue of unitariness is a matter which only the court can decide. To say that answers given to these questions provided proper foundational evidence for the trial court's findings ignores Fed.R.Evid. 701 and suggests surmise will satisfy a party's burden of proof.
 
 
 [50]
 Defense counsel asked plaintiffs' expert, Dr. Mary Lee Taylor, if the Plan was adopted with discriminatory intent. The question followed her extensive direct testimony on the impact of institutional racism over time and the effect of the Finger Plan's unlinking many of those discriminatory patterns. Defense counsel then asked, "Based upon your educational background and your experience and your review of the facts in this case, you don't feel that the Oklahoma City Board of Education adopted this neighborhood plan with the intent to discriminate against blacks, do you? " (Emphasis added.) Dr. Taylor responded, "I have no evidence of that at all. I did not mean to suggest it." (R. VIII, 1238). Although the question is a non sequitur, the court cited her response to support its conclusion there was no discriminatory intent
 
 
 [51]
 In our analysis, we have declined to mire the legal issues with extensive examination of the conflicting evidence on the question of the effect of integration on student achievement. The dissent wades into this area, citing the testimony of Dr. Sampson, the Board's rebuttal witness, who had compared the achievement of blacks at six all-black parochial schools in the Chicago area to that of black students at Chicago public high schools. Based on this study, Dr. Sampson was asked if black students must be in a classroom with white students to learn effectively. He responded that an "effective schools program" and a dedication to education encompassed by positive socioeconomic conditions assured black student achievement. When asked on cross-examination if intentional segregation of the public schools is harmful, Dr. Sampson responded that it didn't have to be and certainly wasn't for those blacks going to the parochial schools he studied in Chicago. Who could disagree when we compare a self-selected private parochial school setting to a large urban public school. The court, however, used this evidence, comparing the 65% dropout rate of Chicago public high schools to the 80-90% rate of these parochial students who then attend college, to conclude "the racial composition of a school has absolutely no effect on the academic achievement of its students." 677 F.Supp. at 1524. Although we remain uncertain what this testimony was intended to rebut in the first instance, we are certain it cannot represent evidence of the District's commitment to maintain a unitary system
 
 
 [52]
 "One vehicle can carry only a limited amount of baggage." Swann, 402 U.S. at 22, 91 S.Ct. at 1279
 
 
 [53]
 "The constitutional command to desegregate schools does not mean that every school in every community must always reflect that racial composition of the school system as a whole." Swann, 402 U.S. at 24, 91 S.Ct. at 1280
 
 
 [54]
 Former Board president, Mrs. Susan Hermes, conceded that there are no guarantees that student reassignments would not occur for grades 5-12 in the future because of inevitable changes in the Board's membership. (R. III, 361)
 
 
 [55]
 The Finger Plan already accommodated a geographically isolated area in its treatment of the Star-Spencer area
 
 
 [56]
 In Riddick, 784 F.2d at 521, the Fourth Circuit affirmed the district court's finding the reinstitution of a neighborhood school system retained the district's unitariness despite the creation of one-race schools. The court, recognizing that white flight alone cannot justify the failure to dismantle a dual school system, found the "school board legitimately considered the presence of 'white flight' in pursuit of a voluntary plan to stabilize school integration in Norfolk." Id. at 540. In a recent article, Professor Landsberg notes that the early predictions of white flight in Norfolk did not materialize," citing an American Lawyer study that found that "white flight early in the desegregation process does not necessarily provide an accurate prediction of later behavior patterns." 48 La.L.Rev. at 830, n. 192
 
 
 [57]
 This duty is clearly distinguishable from defendants' perception of plaintiffs' position as "nothing more than a plea to continue the busing of Oklahoma City's young students in perpetuity." We do not share that perception. By this remand we do not propose, as stated by the dissent at p. 1516, that amendment of desegregation decrees is only for plaintiffs. That suggestion ignores the plain import of all for which this opinion stands and is unwarranted by anything we have stated
 
 
 [58]
 Because we have vacated the judgment, the Board is no longer a prevailing party entitled to costs and attorney fees
 
 
 [1]
 Surely Justice Powell would not have embraced this court's failure to terminate jurisdiction when a system has achieved and maintained unitary status. His eloquent dissents in Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 478, 99 S.Ct. 2982, 2987, 61 L.Ed.2d 666 (1979) (Powell, J., dissenting), and Dayton Bd. of Educ. v. Brinkman (Dayton II), 443 U.S. 526, 542, 99 S.Ct. 2971, 2981, 61 L.Ed.2d 720 (Powell, J., dissenting), began with the observation that 25 years after Brown v. Board of Educ. (Brown I), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), "the federal judiciary should be limiting rather than expanding the extent to which courts are operating the public school systems of our country." Columbus, 443 U.S. at 480, 99 S.Ct. at 2988 (Powell, J., dissenting). When read against a backdrop of a unitary school system, Justice Powell's concern for federalism, parental and community support of education, student retention and effective public schools are strong arguments against coercive federal authority in the absence of purposeful racial discrimination. See id. at 485-89, 99 S.Ct. at 2990-93
 In dissenting from the dismissal of certiorari petitions, Justice Powell emphasized the importance of "identify[ing] the link between the constitutional violation and the desegregation remedy," and recognized that "[i]n large cities, the principal cause of segregation in the schools is residential segregation, which results largely from demographic and economic conditions over which school authorities have no control." Estes v. Metro. Branches of the Dallas NAACP, 444 U.S. 437, 445, 100 S.Ct. 716, 720, 62 L.Ed.2d 626 (Powell, J., dissenting from dismissal of petitions for certiorari); see also id. at 447, 100 S.Ct. at 721; Columbus, 443 U.S. at 480-81, 99 S.Ct. at 2988-89 (Powell, J., dissenting). Moreover, Justice Powell commented upon the misuse, by lower federal courts, of the remedial language in Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971), that "the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation." Estes, 444 U.S. at 446 n. 13, 100 S.Ct. at 720 n. 13. This court precedes its quote by Justice Powell with that very language from Swann. See Court's Opinion at 1505-06.
 Justice Powell adhered to the well-supported position that the constitutional violation by the school board determines the scope of the applicable remedy. Delaware State Bd. of Educ. v. Evans, 446 U.S. 923, 924-27, 100 S.Ct. 1862, 1862-65, 64 L.Ed.2d 278 (1980) (Rehnquist J. (joined by Powell, J. & Stewart J.), dissenting from denial of certiorari); Cleveland Bd. of Educ. v. Reed, 445 U.S. 935, 937-38, 100 S.Ct. 1329, 1330-31, 63 L.Ed.2d 770 (1980) (Rehnquist J. (joined by Powell, J. & Burger, C.J.), dissenting from denial of certiorari). It is adherence to that principle which seems most in jeopardy following this court's opinion.
 
 
 [2]
 The main opinion and the concurring opinion in Spangler are both opinions of the court; the third member of the panel joined in both. 611 F.2d at 1242
 
 
 [3]
 The blueprint for the court's approach to the substantive desegregation law, but not the injunction law, in this case is contained largely in B. Landsberg, The Desegregated School System and the Retrogression Plan, 48 La.L.Rev. 789 (1988) [hereinafter cited as Landsberg ] (cited in Court's Opinion at 1492, 1492, n. 18 & 1505 n. 56). Compare Court's Opinion at 1499 (concerning the effects of past discriminatory intent) with Landsberg at 817, 826, 837-38 (same); compare Court's Opinion at 1504, 1504 n. 52 (concerning Swann 's remedial baggage) with Landsberg at 819 (same); compare Court's Opinion at 1503 (Swann 's "loaded game board" and unitariness) with Landsberg at 826 (same); compare Court's Opinion at 1505 & 1505 n. 56 (concerning extra-record evidence about Norfolk plan and white flight) with Landsberg at 830 & 830 n. 51 (same); compare Court's Opinion at 1490-91 (concerning compliance alone with injunctions) with Landsberg at 811 n. 121 (same). Mr. Landsberg endorses the Tenth Circuit approach in Dowell, 795 F.2d at 1516. Landsberg at 815 n. 135, 834-35
 
 
 [4]
 Membership by School Race
 
 
 K4
 Elementary Schools
 Includes K4 Portion of K5 Elementary Schools
 198687
School Black Other Total % Black
Adams 23 354 377 6.1
Arthur 23 291 314 7.3
Bodine 199 382 581 34.2
Britton 118 193 311 37.9
Columbus 63 349 412 15.2
Coolidge 23 420 443 5.1
Creston Hills 219 2 221 99.0
Davis 16 145 161 9.9
Dewey 248 4 252 98.4
Edgemere 154 146 300 51.3
Edwards 218 1 219 99.5
Eugene Field 150 321 471 31.8
Fillmore 17 246 263 6.4
Garden Oaks 181 3 184 98.3
Gatewood 68 196 264 25.7
Harrison 83 85 168 49.4
Hawthorne 64 269 333 19.2
Hayes 37 292 329 11.2
Heronville 31 314 345 8.9
Hillcrest 32 243 275 11.6
Horace Mann 67 123 190 35.2
Kaiser 38 171 209 18.1
King 278 3 281 98.9
Lafayette 6 212 218 2.7
Lee 22 309 331 6.6
Lincoln 287 2 289 99.3
Linwood 32 202 234 13.6
Longfellow 230 2 232 99.1
Madison 30 170 200 15.0
Mark Twain 12 111 123 9.7
North Highland 315 8 323 97.5
Oakridge 125 170 295 42.3
Parker 347 11 358 96.9
Parmelee 41 305 346 11.8
Pierce 36 184 220 16.3
Polk 262 3 265 98.8
Prairie Queen 24 362 386 6.2
Putnam Heights 105 196 301 34.8
Quail Creek 31 204 235 13.1
Ridgeview 51 247 298 17.1
Rockwood 176 248 424 41.5
Sequoyah 58 238 296 19.5
Shidler 95 161 256 37.1
Shields Heights 16 385 401 3.9
Southern Hills 16 210 226 7.0
Spencer 264 82 346 76.3
Stand Watie 91 260 351 25.9
Star 212 133 345 61.4
Stonegate 170 343 513 33.1
Truman 369 1 370 99.7
Van Buren 15 178 193 7.7
West Nichols Hills 63 251 314 20.0
Western Village 208 109 317 65.6
Westwood 40 160 200 20.0
Wheeler 25 280 305 8.1
Willard 13 129 142 9.1
Willow Brook 200 188 388 51.5
Wilson 50 139 189 26.4
 -------- ------- ------- -------
Subtotal 6,387 10,746 17,133 37.3
 -------- ------- ------- -------
Arcadia 22 55 77 28.5
Buchanan 20 205 225 8.8
Johnson 51 137 188 27.1
Monroe 42 223 265 15.8
Rancho Village 18 151 169 10.6
Telstar 199 134 333 59.7
 -------- ------- ------- -------
Total 6,739 11,651 18,390 36.6
 -------- ------- ------- -------
 -------- ------- ------- -------
 Pl. ex. 27, reproduced in Appellants' Addendum to Brief at 187-91.
 
 
 [5]
 
 90% k Black Elementary Schools
School Black Other Total % Black
Creston Hills 219 2 221 99.0
Dewey 248 4 252 98.4
Edwards 218 1 219 99.5
Garden Oaks 181 3 184 98.3
King 278 3 281 98.9
Lincoln 287 2 289 99.3
Longfellow 230 2 232 99.1
North Highland 315 8 323 97.5
Parker 347 11 358 96.9
Polk 262 3 265 98.8
Truman 369 1 370 99.7
 ----- ----- ----- -------
Total 2,954 40 2,994 98.7
 ----- ----- ----- -------
 ----- ----- ----- -------
 Pl. ex. 27, reproduced in Appellants' Addendum to Brief at 187-91.
 According to these figures, 43.8% (2954/6739) of the black elementary school population (1-4) attends a 90% + black school.
 This court took a slightly different approach to determining minority concentration in the elementary schools and concluded that 46.2% of the black K-4 elementary students attend a 90% + black school. Court's Opinion at 1497. The court's slightly higher 46.2% concentration figure is different than mine (43.8%) for two reasons. First, the court used the 1985-86 student enrollment data, pl. ex. 26, reproduced in Appellants' Addendum to Brief at 180-81; I used the 1986-87 data contained in pl. ex. 27, reproduced in Appellants' Addendum to Brief at 187-91, and the above table contains the 1986-87 data. Second, the court did not include the K-4 portion of the K-5 schools; I did. Had I followed the court's method with the 1986-87 data and not included the K-4 students which attend K-5 schools, the concentration figure would be 46.3% (2954/6387), meaning that 46.3% of the black K-4 elementary students attended a 90% + black K-5 school.
 Dr. Foster estimated that 2,445 black 1-4 students attended virtually one-race black schools; these black students comprised 46% of the total black students in grades 1-4. Rec. vol. VIII at 1298.
 
 
 [6]
 The following 21 schools are not racially mixed according to this court. See Court's Opinion at 1487, 1487 n. 2
 
 
 K4
 Elementary Schools
 Membership by School
 198586
School % White % Black % Minority *
Lafayette 86.2 2.0 13.8
Shields Heights 66.9 4.0 33.1
Hillcrest 84.5 5.1 15.5
Arthur 79.8 5.7 20.2
Rancho Village 83.8 5.8 16.2
Prairie Queen 84.7 6.2 15.3
Parmelee 79.0 6.3 21.0
Davis 65.1 6.6 34.9
Willard 41.5 6.6 58.5
Coolidge 81.1 7.3 18.9
Buchanan 80.0 7.5 20.0
Lee 55.5 7.7 44.5
Southern Hills 79.0 8.0 21.0
Van Buren 75.7 8.4 24.3
Adams 80.0 8.5 20.0
Fillmore 80.8 8.7 19.2
Linwood 85.1 9.2 14.9
Wheeler 61.7 10.0 38.3
Madison 78.0 10.5 22.0
Hayes 81.0 10.7 19.0
Mark Twain 67.9 10.7 32.1
 
 
 *
 Includes Black, Hispanic, Native American and Asian American
 Def. ex. 63, reproduced in Appellees' Addendum to Brief. None of these schools are virtually one-race white schools. Though these schools contain less than the system-wide average of black students, 38.5%, pl. ex. 26, reproduced in Appellants' Addendum to Brief at 184, and less than the system-wide average of K-4 black elementary students, 36.04%, id. at 181, there is no requirement "that every school in every community must always reflect the racial composition of the school system as a whole." Swann, 402 U.S. at 24, 91 S.Ct. at 1280.
 
 
 [7]
 The school board planned to close 2 of the 90% + black elementary schools (Lincoln & Truman) and reopen 1 (Dunbar) at the end of the 1986-87 school year. Def. ex. 65. The 1987-88 membership projections for the remaining elementary schools reveal ten 90% + black elementary schools. Id. These schools are as follows:
 School % Black
Creston Hills 99.0
Dewey 98.4
Dunbar 98.9
Edwards 99.5
Garden Oaks 98.3
King 98.9
Longfellow 99.2
North Highland 97.5
Parker 96.9
Polk 98.8
 
 
 [8]
 This court repeatedly cites the district court decisions in Keyes, 609 F.Supp. 1491 (D.Colo.1985), and 670 F.Supp. 1513 (D.Colo.1987). See Court's Opinion at 1493, 1494 n. 23, 1497, 1503. Those two decisions are now on appeal to another panel of this court
 
 
 [9]
 This court's reliance on United Shoe, another antitrust case, is further evidence of the paucity of direct authority supporting its position. United Shoe involved one firm's monopolization of the shoe machinery industry; the injunction dissolved the firm into three separate companies. Id. at 246, 88 S.Ct. at 1498. Were we embarking upon some new and uncharted field of law, reliance upon antitrust cases might be justified. However, and with all due respect, I believe that the plethora of desegregation cases decided during the last three decades affords the court a more fruitful source of precedent than tangentially-related antitrust cases; the logical nexus between school children and shoe machinery is a strained one indeed
 This court's reliance upon Swann, 402 U.S. 1 at 15-16, 91 S.Ct. at 1275-76, to support application of commercial prohibitory injunction cases in the school desegregation context is misplaced. Court's Opinion at 1489 n. 8. The Supreme Court did say that "a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." Swann at 15-16, 91 S.Ct. at 1275-76 (emphasis supplied). However, the commercial injunction cases relied upon by this court hardly involve the denial of constitutional rights. Moreover, the Court in Swann emphasized that "judicial powers may be exercised only on the basis of a constitutional violation," and that "[j]udicial authority enters only when local authority defaults." Id. at 16, 91 S.Ct. at 1276.
 
 
 [10]
 This court tells us that "Swann envisioned stability 'once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system.' 402 U.S. at 32, 91 S.Ct. at 1284." Court's Opinion at 1499 n. 39. The above passage indicates just the opposite: demographic stability was not envisioned
 
 
 [11]
 In Clark, a modification of a desegregation plan was approved which resulted in 4 out of 27 elementary schools having all black enrollments. 705 F.2d at 272-74
 
 
 [12]
 This court indicates that a district court is not to retry issues embodied in the original judgment, when passing on a defendants' request for modification or termination of an earlier decree. Court's Opinion at 1492. Presumably that admonition would encompass the 1977 unitariness determination inherent in the 1977 judgment. See Dowell, 677 F.Supp. at 1505 (discussing 1977 unitariness determination in judgment). Yet this court's subsequent discussion of the elements of unitariness, in the context of judging any modification sought by the defendants, is revelatory of a procedure which will replicate the original unitariness determination any time the defendants seek modification of the decree. See Court's Opinion at 1499. It is patently obvious in this case that the plaintiffs are attacking the 1977 determination of unitariness as erroneous. See Appellants' Brief at 25 ("Plaintiffs' position is that school desegregation is required because the effects of the long-maintained dual school system in Oklahoma City persist.") (emphasis in original)
 
 
 [13]
 Citation of Morgan in this court's discussion of post-unitariness criteria that a new student assignment plan must meet, Court's Opinion at 1499, is inconsistent with the meaning and significance the First Circuit placed on a unitariness determination. As the First Circuit explained:
 Although the Court has produced no formula for recognizing a unitary school system, the one thing certain about unitariness is its consequences: the mandatory devolution of power to local authorities. Thus, when a court finds that discrimination has been eliminated "root and branch" from school operations, it must abdicate its supervisory role, in recognition that the "local autonomy of school districts is a vital national tradition."
 Morgan, 831 F.2d at 318, 326 (quoting Dayton I, 433 U.S. at 410, 97 S.Ct. at 2770, and refusing further enforcement of student assignment portion of desegregation decree).
 
 
 [14]
 This court notes that "[i]n Ross, despite its finding of unitariness after 12 years of court-supervised desegregation, the Fifth Circuit affirmed the district court's decision to retain jurisdiction for an additional 3 years." Court's Opinion at 1499 n. 40. This certainly does not support this court's retention of jurisdiction in this case after all the years that have passed since the 1977 unitariness determination. As the Fifth Circuit so recently reminded us, citing Youngblood v. Board of Pub. Instruction, 448 F.2d 770, 771 (5th Cir.1971), its jurisprudence requires that a district court retain jurisdiction for 3 years after a unitariness determination, with semi-annual reports to the court by school authorities, to be followed by notice and a hearing as to why the case should not be dismissed. Overton, 834 F.2d at 1174-75, 1175 n. 12
 
 
 [15]
 The district court is criticized for asking various witnesses whether the board adopted its neighborhood school plan with discriminatory intent, whether the school district was being operated in a unitary fashion and whether it was likely that the school district would return to a dual system if federal control were relinquished. Court's Opinion at 1502-03, 1502 n. 49, 1503 n. 50. This court tells us that "[t]he issue of unitariness is a matter which only the court can decide." Id. at 1502 n. 49. So true of every issue in a bench trial. Unitariness is a factual finding made by the district court and reviewed by the appellate court under the clearly erroneous standard. See Dayton II, 443 U.S. at 534, 534 n. 8, 99 S.Ct. at 2977, 2977 n. 8; Riddick, 784 F.2d at 533; see also Jenkins v. Missouri, 807 F.2d 657, 666-68 (8th Cir.1986) (en banc)
 The district court was attempting to determine the motivation for the plan, whether school authorities were sensitive to their constitutional obligation to operate a unitary school district and whether lifting of the decree was likely to be accompanied by a return to the former dual school system. See Dowell, 677 F.Supp. at 1524 (finding that current school board "is conscientiously oriented to its duty to operate a unitary school system"). In accordance with Keyes, 413 U.S. at 196, 93 S.Ct. at 2691, the district court also was seeking direct evidence of staff and community attitudes concerning the school system. Dowell, 677 F.Supp. at 1518 (citing Keyes ). Had the district court based its entire decision upon only the predictable responses to these questions, there might be a basis for rejecting its factual findings. But that most certainly is not the case. The district court considered the circumstantial evidence of segregative intent but decided the other way, given adequate evidence to the contrary. Dowell, 677 F.Supp. at 1509-10 (student assignment); id. 1517 (neighborhood attendance zones), id. at 1518-19 (faculty/staff assignment).
 In its discussion of the lack of discriminatory intent underlying the neighborhood plan, the district court considered the testimony of plaintiffs' expert Dr. Marylee Taylor, who testified concerning "the longstanding impact of official policies of segregation and discrimination, institutional racism, and prejudice as reflected in areas such as residential patterns and attitudes toward school desegregation." Rec. vol. I, doc. 17, app. E at 3 (Pretrial Order, Plaintiffs' Witness List). After defense counsel ascertained that Dr. Taylor's testimony incorporated her three-day visit to Oklahoma City, the following occurred on cross-examination:
 Mr. Day: Dr. Taylor, it sounds to me from listening to your testimony that you have reviewed a substantial amount of the evidence in this case; is that correct?
 Dr. Taylor: I have--I have certainly reviewed some of the evidence in this case. Yes.
 Mr. Day: And including prior case decisions and things of that nature.
 Dr. Taylor: Yes.
 Mr. Day: You've reviewed the K-4 plan, the Finger Plan and those sorts of things; correct?
 Dr. Taylor: Yes.
 Mr. Day: Based upon your educational background and experience and your review of the facts in this case, you don't feel that the Oklahoma City Board of Education adopted this plan with the intent to discriminate against blacks, do you?
 Dr. Taylor: I have no evidence of that at all. I did not mean to suggest it.
 Rec. vol. VIII at 1237-38. This court tells us that the district court could not consider this last response by Dr. Taylor as supporting an absence of segregative intent by the school board because to do so would be to take the answer "out of context" and because Mr. Day's question which elicited it "is a non sequitur." Court's Opinion at 1503, 1503 n. 50. Both reasons given by the court are without merit.
 Given the scope of Dr. Taylor's testimony, the district court could accept her conclusion concerning an absence of segregative intent by the school board in enacting the neighborhood plan, while rejecting her theory, given all of the evidence to the contrary, that the 1972 Finger Plan had merely suspended the impact of earlier official discrimination and that linking schools to housing with a neighborhood plan recreated "the impact of earlier official discrimination in the schools." See rec. vol. VIII at 1225. In other words, the district court could find that the school system had changed since the 1972 decree and that the dual system and its vestiges had been eliminated.
 Likewise the district court was not in error for failing to recognize a non sequitur contained in Mr. Day's last question, at least as the term is commonly understood. A non sequitur is "an inference or a conclusion that does not follow from the premises," or "a statement containing an illogical conclusion." Random House Dictionary of the English Language, 1317 (2d unabr. ed. 1987). Here, the conclusion propounded (an absence of segregative intent concerning enactment of the neighborhood plan) was based upon the premise that Dr. Taylor's education, experience and review of the evidence in this case would permit her to detect any racism inherent in the enactment the plan. Dr. Taylor was offered as an expert witness "in social psychology and the study of race relations and racial attitudes." Rec. vol. VIII at 1216. The question was perfectly appropriate and her answer surprising given the context of her testimony.
 
 
 [16]
 The dissimilarity index and the exposure index measure the degree of integration in a school system. Dowell, 677 F.Supp. at 1508. There is an inverse relationship between the degree of integration and the value of the dissimilarity index; the higher the dissimilarity index, the lower the degree of integration. Conversely, there is a direct relationship between the degree of integration and the exposure index; the higher the exposure index, the higher the degree of integration
 Before the Finger Plan was instituted, the dissimilarity index for the system in 1971 was .78; in 1984, it was .24; and with the introduction of neighborhood schools the index rose to .38 in 1985. The dissimilarity index does not represent "the ratio of blacks to non-blacks," Court's Opinion at 1495, rather it is the number of students who would have to be reassigned so that each school would have the district-wide proportion of black student enrollment, divided by the number of students who would have to be reassigned if the district were completely segregated. F. Welch & A. Light, New Evidence on School Desegregation-U.S. Comm'n on Civil Rights Clearinghouse Pub. No. 92, 37 (1987) [hereinafter cited as Welch & Light ]; def. exs. 44 & 45; rec. vol. II at 127-28. Below is a chart including the dissimilarity and exposure indices, together with other information about the school system.
 Year Enrollment Percent Black Dissimilarity Index Exposure Index
 1970 71,089 22.9 0.817 0.182
1971 68,840 23.4 0.780 0.222
1972 60,674 26.4 0.277 0.669
1973 54,196 26.7 0.255 0.677
1974 52,143 28.3 0.236 0.670
1975 50,162 29.7 0.246 0.651
1976 47,941 31.1 0.254 0.638
1977 46,274 32.3 0.270 0.619
1978 42,933 33.1 0.245 0.619
1979 42,471 34.8 0.267 0.594
1980 40,961 35.3 0.230 0.603
1981 40,777 35.5 0.233 0.596
1982 41,427 35.5 0.244 0.592
1983 40,513 36.7 0.234 0.584
1984 40,373 38.3 0.244 0.563
1985 40,174 38.6 0.377 0.464
1986 39,837 39.3 0.389 0.453
 Def. ex. 45. The district court noted that the Oklahoma City system experienced the eighth largest reduction in the dissimilarity index out of 125 school districts, prior to introduction of the neighborhood plan. Dowell, 677 F.Supp. at 1508; Welch & Light at 41; rec. vol. II at 131. The district court then relied upon a rank order comparison of dissimilarity index values for comparably sized central city school districts. Dowell, 677 F.Supp. at 1508-09; see also rec. vol. III at 193-94. It should be remembered that the dissimilarity index is a measure of racial balance, rec. vol. II at 129; vol. III at 269, and strict racial balance is not a constitutional requirement, Swann, 402 U.S. at 24-25, 91 S.Ct. at 1280. Also, Dr. Welch suggested a limitation in comparing districts for integration based on the dissimilarity index. Concerning his desegregation study for the United States Commission on Civil Rights, Welch & Light at 2-3, he said:
 We used the dissimilarity index primarily as a vehicle for examining school districts through time. Table 13 ... as we have discussed, is one that simply takes some extreme districts and says, "which districts experienced the largest change ... over the period of time?"
 But we're not trying, typically, in this study to compare one district and say, "This district is particularly well integrated while the other is not," so much as saying "what are the sources of change within districts?" and "what are the plan types that led to the sources of change?"
 Rec. vol. II at 129-30; accord Welch & Light at 38 ("The fact that the dissimilarity index is useful in describing changes within a district does not imply that it is useful in comparing districts.").
 
 
 [17]
 Before the Finger Plan was instituted, the dissimilarity index for the elementary system in 1971 was .83; in 1984, it was .24; and with the introduction of neighborhood schools the index rose to .56 in 1985. A chart including the elementary dissimilarity and exposure indices, together with other information concerning elementary schools, follows:
 Year Enrollment Percent Black Dissimilarity Index Exposure Index
 1970 40,205 23.5 0.888 0.106
1971 38,121 23.5 0.833 0.157
1972 23,744 22.8 0.191 0.737
1973 20,510 23.1 0.231 0.714
1974 19,711 23.0 0.219 0.731
1975 19,143 23.5 0.238 0.719
1976 18,793 24.9 0.237 0.705
1977 18,857 26.4 0.268 0.681
1978 18,115 28.0 0.228 0.675
1979 17,897 28.7 0.217 0.666
1980 17,119 29.6 0.190 0.667
1981 17,062 29.1 0.195 0.666
1982 17,457 28.7 0.203 0.671
1983 17,142 30.4 0.199 0.655
1984 17,285 32.4 0.240 0.622
1985 18,283 36.0 0.564 0.354
1986 18,399 36.6 0.565 0.352
 Def. ex. 44.
 
 
 [18]
 Kindergarten students under the 1972 Finger Plan were permitted to attend schools of choice. Pl ex. 6, reproduced in Appellants' Addendum to Brief at 19. Dr. Foster's proposed desegregation plans did not include kindergarten students in reassignments. Pl. ex. 57 at 1. Thus, it would appear that plaintiffs do not object to the present 5 one-race black, and 6 virtually one-race black, kindergartens at 11 schools. For example, in 1986-87, the 11 virtually one-race black K-4 elementary schools had the following kindergarten enrollments:
 School Black Other Total % Black
Creston Hills 44 1 45 97.8
Dewey 59 0 59 100.0
Edwards 61 1 62 98.4
Garden Oaks 34 0 34 100.0
King 67 2 69 97.1
Lincoln 68 0 68 100.0
Longfellow 48 0 48 100.0
North Highland 72 2 74 97.3
Parker 57 2 59 96.6
Polk 58 2 60 96.7
Truman 76 0 76 100.0
 Pl. ex 27, reproduced in Appellants' Addendum to Brief at 187-88.
 
 
 [19]
 As indicated by Dr. Biscoe, rec. vol. III at 326, there is very mixed empirical evidence concerning the benefits of an integrated education in terms of enhanced student achievement and improved interracial attitudes and relations. See 3 D. Levine, Desegregation in Schools, International Encyclopedia of Education 1368-71 (T. Husen & T. Postlethwaite 2d ed. 1985)
 Plaintiffs' expert Dr. Crain testified that segregated schools inhibit learning, but acknowledged that the studies conflicted concerning the effects of desegregation on achievement. Rec. vol. VII at 971-72. Defendants' expert Dr. Walberg testified, based on a variety of studies "that racial composition of the school is irrelevant to how much children learn in school, and no particular racial composition, such as zero, ten, fifty, ninety, or a hundred makes important differences for how much children learn in school." Rec. vol. VI at 913-14. He indicated that parental involvement and what he termed the "curriculum of the home" is important for academic achievement. Id. at 916. Defendants' expert Dr. Sampson testified that certain home values, such as consistent parental authority, parent-child interaction, and monitoring and reinforcement of children by parents, rather than race or economic status, determine academic achievement. Rec. vol. IX at 1455, 1458. Dr. Sampson testified that "if the purpose of the schools is education," and if an effective schools program was in place, he would not be concerned with 90% + black schools. Id. at 1461.
 Dr. Sampson relied in part upon his research concerning 6 all-black parochial schools located in very poor black communities. Rec. vol. IX at 1456. Only about half the students are Catholic. Id. at 1457. Dr. Sampson looked at why these schools were so successful and concluded that they have characteristics associated with effective schools and the children are motivated at home. Id. at 1457-58. This district stresses effective schools concepts and greater parental involvement in an effort to improve educational outcome. In my view, the district court could consider this evidence as indicative of a lack of segregative intent. See Dowell, 677 F.Supp. at 1524. This court disagrees. See Court's Opinion at 1503-04 n. 51.
 
 
 [20]
 "The courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body." The Federalist No. 78, at 507-08 (A. Hamilton) (Mod. Lib. ed.) (emphasis in original). An inherent limitation of judicial intervention in the educational process is the lack of judicial accountability for the results
 
 
 [21]
 The original stand-alone schools, together with the percentage of black enrollment, were: 1) Arcadia, 68.4% (geographically isolated), 2) Columbus, 19.0%; 3) Edgemere, 20.3%, 4) Horace Mann, 21.6%, 5) Mark Twain, 26.6%, 6) Nichols Hills, 31.2%, 7) North Highland, 50.0%, 8) Riverside, 15.2%, 9) Ross, 27.7%, 10) Shidler, 44.8%, and 11) Stand Watie 26.7%. Pl. ex. 13, reproduced in Appellants' Addendum to Brief at 98. Four (Columbus, Ross, Shidler, Stand Watie) were located south of the Canadian River. Four (Edgemere, Horace Mann, Mark Twain, Riverside) were located north of the river in the central portion of the area, and three (Arcadia, Nichols Hills and North Highland) were located in the far northern portion of the area. See pl. ex 3; pl. ex. 17, reproduced in Appellants' Addendum to Brief at 51
 
 
 [22]
 These schools eligible for K-5 stand-alone status for 1984-85 were Arcadia, Bodine, Britton, Edgemere, Eugene Field, Gatewood, Horace Mann, Putnam Heights, Rockwood, Telstar, Western Village, Willow Brook and Wilson. Def. ex. 72, reproduced in Appellants' Addendum to Brief at 276. Two (Bodine (SE), Rockwood (SW)) were located south of the Canadian River; two (Telstar (NE) and Willow Brook (NE)) were located south of the river, but in the northeast Star-Spencer area of the district; six (Edgemere, Eugene Field, Gatewood, Horace Mann, Putnam Heights, Wilson) were located north of the river adjacent to the northeast quadrant; three (Arcadia (NE), Britton (NW) and which included the Nichols Hills and Lone Star attendance areas), Western Village (NW) were north of the river and in the far northern portion of the main geographic area. See pl. ex. 3; pl. ex. 7, reproduced in Appellants' Addendum to Brief at 51. Thus, although these 13 schools were located throughout the district, the majority of the schools formed a band more or less in the middle of the district
 
 
 [23]
 This court apparently finds the district court's factual findings concerning the projected number of stand-alone schools and demographic change clearly erroneous, partly because the statistical forecasts developed by defendants' expert Dr. Welch indicated that some school attendance areas, which are predominantly black, may decline from 100% black in 1986 to 93.2% black in 1995 (a drop of 6.8%) or from 93.2% black in 1986 to 89.6% black in 1995 (a drop of 2.7%). See Court's Opinion at 1488, 1495, 1495 n. 31, 1498; def. ex. 11 at 2
 The court contends that Dr. Welch's 1995 projections should be rejected as clearly erroneous because Dr. Welch gave testimony "directly controverting that of Dr. Clark." Court's Opinion at 1495. Dr. Clark testified that "there's a very, very small proportion of white households that will move into neighborhoods that are heavily minority," and that concentrated minority residential areas are unlikely to change. Rec. vol. II at 105-06. The court also appears concerned with the statistical methodology used by Dr. Welch. Court's Opinion at 1495-96. When the testimony is unraveled, it is apparent that Dr. Welch's testimony is a sufficient basis for the district court's findings; this court is merely reweighing the evidence.
 Dr. Welch used a three step procedure to forecast the percent black in each attendance area: 1) time series regression to forecast the district-wide black student percentage, 2) time series regression to forecast the total number of students in each attendance area, and 3) a complicated procedure to allocate the black students to particular areas based upon the distribution of blacks in the particular attendance areas and adjacent areas. Rec. vol. III at 236, 242-43, 249.
 Concerning the second step, Dr. Welch used two models, one linear and the other exponential, to predict enrollment within the attendance areas. Id. at 238-39. This was done so as to most accurately extrapolate current enrollment trends. For example, if enrollment had dropped during the most recent seven years, Dr. Welch selected the model that would project a continuing drop. Id. at 241; see also id. at 245. Dr. Welch testified that demographers routinely do this in making predictions--"[p]eople who are doing forecasting use a variety of models." Id. at 241.
 Concerning the third step, plaintiffs' counsel, Mr. Chachkin, asked why Dr. Welch did not use trend regression to forecast the percentage of blacks in each attendance area based upon the past percentage of blacks relative to total enrollment. The question comes down to why Dr. Welch "used a ratio rather than a percentage" in his third step. Id. at 249 (emphasis added). Dr. Welch responded that there were two reasons why he did not proceed in the third step as plaintiffs' counsel suggested: 1) the results would not have been consistent, and 2) such an approach "would not have added to reasonable behavior at a district-wide level." Id. at 243. It was in response to this question that Dr. Welch testified that he wanted an internally consistent forecast because someone would be cross-examining him. See Court's Opinion at 1495 (quoting rec. vol. III at 244).
 This court has blended the points brought out in cross-examination (concerning the second and third steps of the statistical model) and given a somewhat misleading picture. Id. The court says:
 Noting that he used two different methods for calculating the 1974 to 1986 figures and the 1986 to 1995 figures, Dr. Welch conceded: "And I really didn't want an inconsistent forecast. I thought someone would be cross-examining me. And so I designed the procedure to be completely internally consistent."
 Id. at 1495. In my view, Dr. Welch should not be faulted for using those procedures which are likely to result in more accurate forecasts. Rec. vol. III at 246.
 Dr. Welch was hardly evasive concerning the limitations of historical forecasting which is used routinely: "There is literally no scientific basis for assuming that the world regenerates itself." Id. at 241. He admitted that, given more time, he could generate measures of reliability and improve the procedure. Id. at 246. In sum, he said:
 Dr. Welch: "How wide are the intervals?" I can't guess, but I think it would be appropriate to call these numbers guesstimates, that I think they're straight-faced, they come from a serious procedure that's applied conscientiously, there's no result in terms of configuration that I'm working to. I'm trying to describe the data. I think I've done that.
 ...
 But you certainly don't want to look at a number like ... .193 [the projected black percentage for Lee elementary in 1995, Def. ex. 11 at 2] and see the "3," and when you see the "9," you probably want to say .15 to .25. That's--I mean, they're an indication.
 Id. Thus, the point estimates he generated for predominantly black schools are within a range of accuracy. When questioned by Mr. Chachkin about this Dr. Welch explained that regression estimators characteristically fail to predict extremes. Id. at 254.
 With the above in mind, the district court was hardly required to reject Dr. Welch's forecasting and its implications merely because the forecasting indicated that some attendance areas may be 93.2% black when it is more likely that they will be 100% black. To require absolute accuracy in forecasting is an impossibility. Moreover, the forecast is certainly consistent with the present racial composition of those neighborhoods. This court's problems with the statistical forecasting go to the weight it should be accorded, not its sufficiency.
 
 
 [24]
 Plaintiffs' expert Dr. Crain testified, concerning the majority-to-minority transfer option, that "it would be astonishing to expect very many blacks to volunteer for the frightening experience of sending their children across town to an all-white school." Rec. vol. VII at 1011. He indicated that only "a tiny percentage" would choose the option. Id. Plaintiffs' expert Dr. Foster testified that "the children who need desegregated schools ... the most[ ] may be the least likely to take that option." Rec. vol. VIII at 1196
 When cross examined by plaintiffs' counsel Mr. Shaw, a member of the school board, Mrs. Hermes, indicated that the district would honor the majority-to-minority transfer program even if every black parent exercised the option. Rec. vol. III at 369.
 
 
 [25]
 See rec. vol. III at 339 (Dr. Biscoe indicated that "[a]ll of the data that we currently have indicates that parent involvement has increased significantly" under the operation of the plan.); id. at 350, 354 (Board member Hermes (1980-present) testified that PTA units increased from 15 to nearly 50 with the enactment of the plan; opportunity to participate in extracurricular activities is greater under plan); vol. IV at 429, 435 (Board member Dr. Muse (1982-86) testified that the plan increased community involvement and support, which was one of the purposes of enacting it); id. at 516-20, 26 (Board president Mrs. Hill (1976 to present) testified about unsuccessful attempts to increase elementary parent involvement before implementation of neighborhood plan; school board sought to increase parental involvement); vol. V at 629-30 (Mr. Owens, a black parent in the northeast quadrant supported neighborhood plan; noted increased parental involvement with plan); id. at 639-43, 650-51 (Dr. White, a black parent, favored neighborhood plan because increased parental involvement expected; Dr. White formed coalition and collected 400 signatures in northeast quadrant in favor of plan); id. at 736-37 (Dr. Steller, school superintendent, testified that with the return of neighborhood schools parents were much more willing to participate in PTA, parent conferences and open houses); id. at 775-76 (Karen Leveridge, former local, state and national officer in PTA, testified that implementation of the neighborhood plan was one of the major reasons responsible for increased PTA participation); id. at 790-91 (Odette Scobey, principal of Truman Elementary with 27 years service, testified that parents have become more involved in helping in the classroom and attending parent conferences since the neighborhood plan was implemented); rec. vol. VI at 853-55 (Robert Brown, principal of Martin Luther King Elementary, testified that parental involvement and support has increased since the enactment of the neighborhood plan); id. at 863 (Billie Oldham, district-wide PTA council president who organized new PTA units testified that she saw a great increase in parental involvement with the neighborhood plan); contra rec. vol. IX at 1413-14 (Clara Luper, high school teacher and NAACP Youth Adviser, testified that only 8 parents attended the Longfellow PTA meeting when she was a guest and that Harrison Elementary had "a very effective PTA," but that it was "mixed in with school activities."); id. at 1434 (Senator Porter, NAACP President, hearsay concerning effective functioning of PTA's under 1972 plan)
 
 
 [26]
 Many black parents and school personnel supported the neighborhood plan. See supra note 25. Mrs. Luper, who opposed the plan, was asked about the "various positions" taken in the black community concerning the neighborhood plan at which time she questioned the motives of black school personnel, see Dowell, 677 F.Supp. at 1519, who supported the neighborhood plan:
 Mr. Shaw: What is your understanding concerning those positions?
 Mrs. Luper: Once again, those positions are based on who you're talking to. Throughout history, we have had people that have always been able ... to protect their own interests.
 I noticed with a great deal of interest the employees of the board of education that were--that have testified here, but I have also noticed that those employees have never been involved in anything in this city to change conditions of black people. Now, I've noticed that, and that's really important.
 Rec. vol. IX at 1415. Mrs. Luper's statement does not allow for an honest difference of opinion among blacks on the issue of the neighborhood assignment plan.
 
 
 [27]
 In discussing the disadvantages of the proposed Foster Plan, the district court summarized its objections and mentioned cross-town busing and "the potential harms related to busing students at this tender age." Dowell, 677 F.Supp. at 1526. Indeed, student transportation is a significant factor in the Foster Plan. Dr. Foster estimated that 85 buses would be needed to transport 4,000 elementary students at an initial cost of $3,500,000 and a recurring cost of $982,712. Rec. vol. VIII at 1312-13. Dr. Steller disagreed with these figures, finding that 125 buses would be needed. The district court apparently agreed with Dr. Steller, finding that the total cost of Dr. Foster's plan (including the significant element of transportation) would be approximately $7.4 million the first year and $1.7 million thereafter. Dowell, 677 F.Supp. at 1525; rec. vol. IX at 1500
 This court paid close attention to the testimony concerning busing and implies that the desirability of busing elementary students to achieve racial balance probably ought not to be questioned yet. Court's Opinion at 1496. Of course, in a system charged with an affirmative duty to desegregate, the Supreme Court has made it clear that busing may be an appropriate tool to liquidate a dual system and that objections to transportation will be countenanced only "when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process." Swann, 402 U.S. at 30-31, 91 S.Ct. at 1282-83. Limitations on time and travel are a function of student age. Id. at 31, 91 S.Ct. at 1283. Without question, elementary students including four- and five-year-olds may be bused reasonable distances in order to dismantle a dual system. Swann, 402 U.S. at 29 n. 11, 91 S.Ct. at 1282 n. 11.
 In a unitary system, however, the desirability of busing elementary 1-4 students may be questioned. Quite apart from the fact that the cost of additional transportation will divert funds from the district's educational mission and necessitate reductions in current programs, rec. vol. IX at 1502-05, Dr. Steller predicted that parental involvement would plummet, id. at 1482-84.
 
 
 [28]
 "The most important characteristics of effective schools are strong instructional leadership, a safe and orderly climate, school-wide emphasis on basic skills, high teacher expectations for student achievement, and continuous assessment of pupil progress." U.S. Dep't of Education, What Works-Research About Teaching and Learning 45 (1986). Dr. Hughes testified that effective schools techniques are being implemented successfully in the Oklahoma City elementary schools. Rec. vol. V at 685-88
 
 
 [29]
 
 Elementary Schools' Enrollment
 and Faculty Racial Composition
 (ranked by % Black Faculty)
 198687
 Elementary School Black Teachers Total Teachers % Black % Black
 Teachers Students
 Edwards 5.9 8.4 70 99.5
Telstar 9.0 13.8 65 59.7
Lincoln 8.1 12.6 64 99.3
Garden Oaks 4.5 9.0 50 98.3
Polk 6.0 13.0 46 98.8
Parker 7.5 16.3 46 96.9
Truman 7.5 17.0 44 99.7
King 5.9 13.6 43 98.9
Creston Hills 4.0 9.4 43 99.0
Dewey 4.0 9.5 42 98.4
Willow Brook 6.8 16.3 42 51.5
Hawthorne 5.8 14.3 41 19.2
Edgemere 5.8 14.8 39 51.3
Longfellow 4.6 12.1 38 99.1
Westwood 4.0 10.5 38 20.0
Harrison 3.0 7.9 38 49.4
North Highland 5.6 14.6 38 97.5
Rockwood 7.0 19.5 36 41.5
Shidler 4.6 13.1 35 37.1
Mark Twain 2.2 6.2 35 9.7
Horace Mann 3.0 9.0 33 35.2
Putnam Heights 4.0 12.7 31 34.8
Kaiser 2.5 8.0 31 18.1
Star 5.0 16.0 31 61.4
Shields Heights 5.0 16.5 30 3.9
Quail Creek 3.0 10.0 30 13.1
Spencer 5.0 16.6 30 76.3
Heronville 4.0 13.6 29 8.9
Ridgeview 3.6 12.6 29 17.1
Hayes 4.5 15.5 29 11.2
Monroe 4.5 16.5 27 15.9
Gatewood 3.0 11.3 27 25.7
Columbus 4.8 17.8 27 15.2
Wheeler 3.6 13.1 27 8.1
Oakridge 3.2 12.1 26 42.3
Fillmore 3.0 12.1 25 6.4
Stonegate 5.0 20.5 24 33.1
Sequoyah 3.2 13.1 24 19.5
Britton 3.0 12.6 24 37.9
Bodine 5.5 24.0 23 34.2
Western Village 2.8 12.3 23 65.6
Southern Hills 2.0 8.9 22 7.0
Lafayette 2.0 8.9 22 2.7
Van Buren 2.0 9.0 22 7.7
Willard 1.2 5.7 21 9.1
Parmelee 3.0 14.6 21 11.8
Wilson 2.0 9.5 21 26.4
Arcadia 1.0 5.1 20 28.5
Stand Watie 3.0 16.0 19 25.9
Lee 3.5 19.0 18 6.6
Hillcrest 2.0 11.4 18 11.6
Coolidge 3.0 17.0 18 5.1
West Nichols Hills 2.0 11.5 17 20.0
Eugene Field 4.0 23.3 17 31.8
Prairie Queen 3.0 17.5 17 6.2
Madison 1.0 6.0 17 15.0
Davis 1.2 7.2 17 9.9
Johnson 2.0 13.1 15 27.4
Arthur 2.0 13.6 15 7.3
Adams 2.0 14.8 14 6.1
Buchanan 1.0 10.1 10 8.8
Pierce 1.0 10.1 10 16.3
Linwood 1.0 10.1 10 13.6
Rancho Village 0 10.2 0 10.6
 -------------- --------------
Total 237.9 820.4
 -------------- --------------
 -------------- --------------
 Fifth-grade centers omitted because of non-comparable grade structure of Hoover. Chart compiled from pl. ex. 54 with additional detail from pl. ex. 29.
 
 
 [30]
 In discussing Mr. Rabin's testimony, the court refers to him as "Dr. Rabin," and indicates that the district court would have done well to "reference" his testimony. Court's Opinion at 1496. Mr. Rabin was qualified as an expert on planning and land use and the analysis of population distribution and its change over time. Rec. vol. VII at 1119. He is qualified but, as was brought out on cross-examination, Mr. Rabin does not hold a doctorate degree or any other postgraduate degree. Id. at 1135-36
 Based on Mr. Rabin's testimony, this court takes issue with the district court's discussion concerning the relocation of the black population which has occurred in the district. Court's Opinion at 1496; Dowell, 677 F.Supp. at 1507-08. Mr. Rabin testified concerning the characteristics of various census tracts which had more than 75% + black residents. He noted that the black population has increased 2.75 times between 1950 and 1980 and that spatially, "the area of black concentration has increased very substantially." Rec. vol. VII at 1129.
 Year Number of Census % of Black Population in No. of Black Residents
 Tracts 75% k Black Those Tracts in Those Tracts
1950 1 24.9 5,236
1960 6 69.5
1970 13 73.3
1980 16 60.8 35,691
 Id. at 1132-35. The 90% + black enrollment schools are located in the concentrated tracts. Id. at 1134-35.
 Dr. Clark analyzed 7 tracts which were concentrated in 1960 over time. One justification for studying these tracts is that they have been predominantly black throughout the entire period beginning with the district court's decree in 1963, Dowell v. School Bd., 219 F.Supp. 427 (W.D.Okl.1963). See rec. vol. VII at 1153-54. Dr. Clark determined that in 1960, 84% of all blacks in Oklahoma City resided in these tracts; by 1980, only 16.8% resided there. Dowell, 677 F.Supp. at 1507. In my view, Dr. Clark came to the permissible conclusion that there was "a fair amount of population change going on in the area." Rec. vol. II at 71. He readily pointed out that census data cannot tell us that the expansion of the black population throughout the school district was attributable to blacks moving out of these tracts, but he did make the reasonable inference that some of the black population expansion in the western and southern parts of the city and county was attributable to migration from the inner city area. Id. at 71-72. He also acknowledged the limitations of census data just as Mr. Rabin did, rec. vol. VII at 1156, 1159, and as this court attempts to do. Id. at 71; see Court's Opinion at 1494 (declaring the long census form "suspect").
 To get away from the limitations inherent in the census data, Dr. Clark compiled relocation maps which indicate residential change for those kindergarten students who resided in the attendance areas of the fifth-year centers in 1974-75. Def. ex. 7, reproduced in Appellee's Addendum to Brief. Three years later, by 1977-78, of those families who relocated, 209 moved out of the school district entirely, 148 relocated within the fifth-year attendance areas and 70 moved outside these predominantly black attendance areas. Dowell, 677 F.Supp. at 1507; see also Court's Opinion at 1496 (finding that 46 of the 70 moved into "white areas."). Only one family moved to the elementary attendance area to which their child was being bused. Dowell, 677 F.Supp. at 1507. A similar analysis was done for families with K-2 children in 1982-83 who had relocated by 1984-85. Def. ex. 8, reproduced in Appellees' Addendum to Brief; Dowell, 677 F.Supp. at 1507-08. The district court concluded from the studies that compulsory busing does not influence black relocation patterns. Dowell, 677 F.Supp. at 1508.
 This court criticizes the relocation studies because 1) many thousands of black families live in the area, and 2) "the more predominant population shift, 148 families, was within the northeast quadrant." Court's Opinion at 1496. Actually, the most predominant population shift was to areas outside the studied area--some 279 families out of 427 relocated outside the district (209) or outside the studied area (70). Of those who stayed in the district, only 34.6% (148/427) stayed within the studied area. As for the court's second objection, as a practical matter the nature of the study was small; it would be unreasonable to expect the school board to offer a study with information about every relocation in the district. Even Mr. Rabin conceded that the information established that some black children and families have left the northeast quadrant and moved out to other areas of the community--he had "no doubt that that took place." Rec. vol. VII at 1157.
 The district court could rely upon the demographic data in the case to conclude that there had been movement from the northeast quadrant, that residential concentration of a portion of the black population is not a vestige of a dual school system and that the defendants cannot and are not charged with the duty of eliminating residential separation. See Dowell, 677 F.Supp. at 1512, 1521.
 
 
 [31]
 Counsel for the school board asked some awkward questions when cross-examining Dr. Crain concerning the value of interaction between black and white children outside of school. See Court's Opinion at 1501 n. 45. Let it not go unsaid that counsel quickly admitted his "poor choice of words." Rec. vol. VII at 1093
 
 
 [32]
 The neighborhood plan provided for an Equity Officer and Equity Committee to monitor the schools for equality. Court's Opinion at 1501; pl. hearing ex. 1 at 4; rec. vol. VI at 831. Rev. Gary Bender, chairman of the committee, testified concerning minority representation on the committee and the desire of the committee to augment the Student Interaction Plan. Rec. vol. VI at 831, 842. He also testified that in addition to concern with facilities and textbooks, the committee had also looked into the quality of the teaching staffs. Id. at 831-33
 
 
 [33]
 For example, Maridyth McBee testified concerning student retention from the fourth to the fifth grades:
 Mr. Day: Ms. McBee, as a research specialist with the Oklahoma City School District, do you see any special significance to the retention ratios ... over time?
 Ms. McBee: It's obvious to see that the number of black students who were fourth graders and then subsequently become fifth graders is very similar. There are almost the same number in fourth grade as fifth grade.
 For the others, that was the case in '71. However, since '71 we have lost substantial percent of non-black students from the fourth to fifth grade until 1986 when the number--the percent retained is higher.
 Rec. vol. IV at 537. Clearly, the threat of white flight cannot justify a return to a dual system, however, the board may consider improved student retention in the elementary grades and its consequences for the secondary grades in an effort to secure wider integration. See Parent Ass'n of Andrew Jackson High School v. Ambach, 598 F.2d 705, 719-20 (2d Cir.1979); Higgins, 508 F.2d at 794. Here, the school board has retained transportation for racial balancing in all but the first four grades notwithstanding its effect on student retention.